# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GENER8, LLC and SYMBIENT ) 
PRODUCT DEVELOPMENT, LLC, )
) 
Plaintiffs, )
) 
v. ) C.A. No. 2022-0426-LWW
) 
SCOTT CASTANON, )
) 
Defendant. )

## MEMORANDUM OPINION

Date Submitted: June 16, 2023
Date Decided: September 29, 2023

Jonathan M. Stemerman & Luke W. Mette, ARMSTRONG TEASDALE, LLP, Wilmington, Delaware; Donald W. Schroeder & Paul G. King, Jr., FOLEY & LARDNER LLP, Boston, Massachusetts; Maureen M. Stewart, FOLEY & LARDNER LLP, Tampa, Florida; Krista M. Cabrera & Mickle S. Jew, FOLEY & LARDNER LLP, San Diego, California; *Counsel for Plaintiffs Gener8, LLC and Symbient Product Development, LLC*

Kurt M. Heyman, Jamie L. Brown, Elizabeth A. DeFelice & Jenny Li, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Defendant Scott Castanon*

**WILL, Vice Chancellor**

In February 2020, Scott Castanon sold Symbient Product Development, LLC—the company he had founded—to Gener8, LLC for $14.4 million. As a condition to the sale, Castanon agreed to restrictive covenants prohibiting him from competing with Symbient and from soliciting its employees or customers for five years.

Castanon's employment with Symbient ended on May 21, 2021. He immediately became involved in launching a company called Protoshop. Although Protoshop was nominally started by Castanon's stepson, Castanon was the mastermind. Castanon secured office space, guaranteed equipment loans, and provided the business's startup capital. He messaged Symbient customers to advertise "his" new venture. He encouraged former Symbient employees to join Protoshop. And he advised Protoshop's team on projects for former Symbient clients.

Castanon does not seriously dispute these facts (other than a farce about Protoshop's funding being from a fictional rich uncle). To be sure, Castanon tried to conceal his involvement—including by deleting electronic evidence. But he acknowledges that he provided substantial assistance to Protoshop.

Castanon's central defense is that Protoshop is not Symbient's competitor. This was disproven at trial. Symbient designs and fabricates prototype molds to create product prototypes. According to its website, Protoshop also performs

1

prototype mold fabrication and offers design assistance services. It is no accident that Protoshop's website advertises with images taken directly from Symbient's own marketing materials. Protoshop is plainly targeting a slice of Symbient's work.

Ultimately, judgment is entered for the plaintiffs on their breach of contract claims. By forming a competing business and (at least indirectly) soliciting Symbient customers and employees, Castanon violated his restrictive covenants and harmed the plaintiffs. The plaintiffs also proved that Castanon spoliated evidence and is in contempt of a court order barring him from working on Protoshop's behalf. Sanctions, including two adverse inferences, are issued as a result.

The plaintiffs' entitlement to a remedy for their harms, however, is limited. Castanon does not draw a salary from or hold equity interests in Protoshop. No damages from lost customer contracts were shown at trial. The plaintiffs proved only that they have incurred costs to hire and train new employees after losing staff to Protoshop. Money damages to address these out-of-pocket losses are awarded, plus pre-judgment interest, attorneys' fees, and injunctive relief to prevent future breaches.

# I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1] Trial was held over three days during which seven fact and two expert witnesses testified live.[2] The trial record includes 742 exhibits and 17 deposition transcripts.[3]

## A. Symbient's Business[4]

Scott Castanon founded Symbient Product Development, LLC in or around 2004.[5] He served as Symbient's Chief Executive Officer until the spring of 2021, and his employment ended on May 21, 2021.[6] Symbient is a contract design engineering and manufacturing company "focused on development of medical/life science consumables" and prototyping.[7] It is a California limited liability company with its principal place of business in Sunnyvale, California.[8]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 119) ("PTO"). To the extent that conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

[2] Dkts. 135-38. Trial testimony is cited as "[Name] Tr."

[3] *See* Dkt. 135. Facts drawn from exhibits jointly submitted by the parties at trial are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. Deposition transcripts are cited as "[Name] Dep."

[4] After its acquisition, Symbient operates as part of Gener8, LLC. At times, I refer to Symbient and Gener8 interchangeably.

[5] PTO ¶ II.B.22.

[6] *Id.* ¶¶ II.A.4, II.B.39.

[7] JX 17 at 4; *see* Castanon Tr. 238-39; Ceriani Tr. 465-67; Helm Tr. 82-83.

[8] PTO ¶ II.A.2.

Symbient uses prototype molds to create product prototypes, offering so-called "rapid prototyping."[9] Customers come to Symbient with initial product designs ranging from napkin scrawls to three-dimensional computer-assisted design (CAD) models.[10] Symbient's role is to efficiently design and build a prototype version of the imagined products.[11]

Symbient follows a five-phase development process to transform product designs into prototype product molds and prototypes to be transitioned into production and manufacturing.[12] The five phases are:

- **Phase 1**: Defining product requirements; developing concepts for potential design solutions; and analyzing and presenting concepts to determine which concept best meets product requirements.[13]

- **Phase 2**: Modeling the selected concept; fabricating and testing a rapid prototype against product requirements; and iterating the design.[14]

---

[9] JX 17 at 2; Helm Tr. 79-81; Castanon Tr. 242.

[10] Ceriani Tr. 531-32; *see also id.* at 465; Helm Tr. 75, 121; JX 129 (Symbient working with a customer on the design of a product).

[11] Helm Tr. 79 ("It's the process of quickly fabricating or manufacturing prototypes . . . . And so you are using methods that, in the rapid prototyping phase, that are a little bit lower fidelity, but get you a prototype quickly that gets you something testable."); Castanon Tr. 242 ("[Speed is] the most important thing to [device design customers]. They're coming to us specifically because of our ability to get products to market faster than anyone else.").

[12] JX 73 at 3-4; *see also* JX 17 at 6; Ceriani Tr. 465-67, 531-33; Helm Tr. 74-78, 121.

[13] JX 73 at 3-4; *see also* JX 17 at 6.

[14] JX 73 at 3-4; *see also* JX 17 at 6.

4

- **Phase 3**: Fabricating prototype tooling; molding and assembling functional devices; and iterating the mold and assembly until product requirements are met. [15]

- **Phase 4**: Performing design verification testing to confirm that product requirements are met across a statistically significant sample.[16]

- **Phase 5**: If requested by the customer, transferring the prototype molds to a contract manufacturer to create production molds, and supporting patent and regulatory approval processes.[17]

The transformation from an idea to a prototype design to a negative prototype mold design to an injection molded prototype is not always linear; each phase can affect others.[18] Phases 2 and 3, for instance, overlap to include so-called "moldability review."[19] After the product design is finalized, Symbient ensures that it is "moldable."[20] Often, "moldability review" results in changes to the product design.[21]

---

[15] JX 73 at 3-4; *see also* JX 17 at 6.

[16] JX 73 at 3-4; *see also* JX 17 at 6.

[17] JX 73 at 3-4; *see also* JX 17 at 6.

[18] *See* Helm Tr. 78, 140; Ceriani Tr. 472, 533.

[19] Helm Tr. 140; Ceriani Tr. 472.

[20] Ceriani Tr. 472; *see also id*. at 473, 533, 538-39; Helm Tr. 140.

[21] Ceriani Tr. 473-74.

The focus of Symbient's business is on the full development cycle with a particular emphasis on Phases 1 and 2—the most profitable phases.[22] Many Symbient customers take an "off-ramp" after the early design stages rather than complete the cycle.[23] Such customers find another company to create prototype molds and fabricate prototypes.[24]

A relatively smaller group of customers come to Symbient by way of an "on-ramp" later in the development cycle.[25] If customers have a design prepared, they might ask Symbient to create a prototype mold and use injection molding to fabricate a prototype.[26] Symbient avoids these "molding-only" or "standalone prototype molding" jobs.[27] They are lower margin and diminish Symbient's

---

[22] *See* Helm Tr. 72; Jurkiewicz Tr. 694-95; Ceriani Tr. 458-59, 471 ("My understanding is that the reason that we didn't take on molding-only jobs . . . is that there was very little profit, if any, and the big money was on the first two phases."); Castanon Tr. 239 ("[Symbient] was first and foremost an engineering firm, and all the other services supported that."); *see also* JX 122 (estimating $1.3 million in annual revenue from "prototype fabrication services"); JX 44 at 11 (estimating total revenue of $6.8 million in 2019).

[23] Helm Tr. 76; *see also* Ceriani Tr. 466; JX 129 at 1 (example of customer considering an off-ramp).

[24] *See, e.g.*, JX 129 at 1 (customer "hoping to send out a design sometime next week to get some rapid prototype injection molding done" at another company).

[25] *See* Helm Tr. 121-22.

[26] *See* JX 23; JX 38 at 1; JX 13; JX 26; JX 214; JX 120; Helm Tr. 75. "Molding-only" projects skip Phases 1 and 2 of Symbient's development cycle. Ceriani Tr. 473.

[27] Helm Tr. 119; *see also* JX 38 at 1 (explaining that Symbient's "general rule is to only fabricate parts that [it] designed"); Castanon Tr. 240; Ceriani Tr. 470; JX 23 at 2; JX 13 at 3 ("As a general rule, [Symbient] only fabricate prototypes that we designed, as we are not so much in the fabrication business . . . as we are in the product design/development

6

prototype molding resources for customers needing the full development cycle.[28]

Symbient often outsources "molding-only" jobs to other companies.[29] To facilitate referrals, Symbient keeps a list of "molding partners" that (unlike Symbient) are not design-focused.[30]

Symbient's consideration of a customer's design intent gives it a competitive advantage over molding-only companies.[31] Symbient offers a fully integrated process, helping customers create prototypes from little more than an idea.[32]

---

business."); JX 214 at 1 ("[Symbient] [doesn't] take molding jobs unless we have developed the prototype. We are a development/engineering house with small manufacturing capabilities for the customers we have developed a product for."); JX 120; JX 365.

[28] *See* Helm Tr. 119; Castanon Tr. 240; Ceriani Tr. 470-71; JX 88 at 1 ("[W]e [Symbient] typically don't take on projects that are tool [i.e., mold] fab and molding only. We don't make any money on the shop; it's there to service our engineering projects.").

[29] Helm Dep. 59, 62; JX 331 at 1("[I]t is important to have one or two outside shops that could support us when we get backed up. We work with several machine shops here in the bay and we have a good working relationship with a couple of them . . . . [W]hile keeping the mold design and prototyping in house[.]"); JX 139; JX 365. Symbient also outsourced protype molding jobs when its projects became backlogged. *See* Helm Tr. 119, 144-45; Castanon Tr. 240; Ceriani Tr. 567-68.

[30] JX 95; *see* Helm Dep. 67.

[31] JX 129 at 1 ("Since we usually design the parts, design the mold and mold the parts, we understand the design intent so we design the mold accordingly."); *see* Helm Tr. 152; Castanon Tr. 243, 266-67; JX 17 at 7 (boasting "accountability in design" and "[i]f we design it, we prove it with final molded assemblies").

[32] *See* Ceriani Tr. 532 ("The primary function [of Symbient] was to change – to come up with the design . . . . Symbient generates the CAD. Symbient does testing. Symbient figures out how to get it working, and then Symbient provides the CAD of that part that is then ready to go to fabricate a mold."); Jurkiewicz Tr. 694-95 ("[Symbient is] an engineering services company that does design services and prototyping services, and part

Although Symbient avoids projects limited to Phase 3 prototype molding and prototype fabrication, prototyping services remain central to Symbient's business and full development process.[33] These prototype molding and fabrication services are the "key[s] to the castle."[34] Without them, Symbient would be unable to rapidly iterate prototype products to finetune a product design.[35]

## B. Gener8's Acquisition of Symbient

In the summer of 2019, Gener8 and Symbient began collaborating on customer projects.[36] Gener8 is a California limited liability company headquartered in Sunnyvale, California.[37] G8 Holdings, LLC, a Delaware limited liability company, owns all of Gener8's membership interests.[38] The ultimate majority

---

of those prototyping services are manufacturing prototype molds and manufacturing prototype components.").

[33] *See* JX 17 at 2; Castanon Tr. 239 ("Q. What were Symbient's core competencies? A. They were mostly engineering-focused. Such as helping the customer establish requirements, creating concepts, modeling designs, creating prototypes, testing, iterating, creating a prototype mold, design verification, assembly, process, design. And then transfer to manufacturing as a final step."); Jurkiewicz Tr. 665-66 ("Q. Is mold design core to Symbient's business? A. Yes. . . . Q. Is rapid prototype fabrication core to Symbient's business? A. Yes.").

[34] Helm Tr. 129-30 ("There's kind of a core part of the business, like food service, like prototype molding. That's kind of the key to the castle, in a sense, because if you don't offer that, then you're not all that competitive.").

[35] *See* Helm Tr. 130.

[36] PTO ¶ II.C.23.

[37] *Id.* ¶ II.A.1.

[38] *Id.* ¶ II.B.1.

owner of G8 Holdings is Sverica Capital Management Partners IV, which is managed by Sverica Capital Management LP ("Sverica"), a Delaware limited partnership.[39] On February 20, 2020, Gener8 acquired Symbient pursuant to an Equity Purchase Agreement (the "EPA").[40] The EPA was executed by and among Gener8, Symbient, SPD Newco, Inc., and (for limited purposes) the Castanon Family Trust, Castanon, and Randi Castanon.[41] In exchange for selling his Symbient interests, Castanon received $9,150,000 in cash and 2,932,961 "rollover units" in G8 Holdings valued at $5,250,000.[42]

### C. The EPA's Terms

Castanon agreed to several restrictive covenants in the EPA. The covenants prevent Castanon from competing with Symbient's business and from soliciting Symbient and Gener8's employees and customers. Castanon agreed that the restrictions "constitute[d] a material inducement to [Gener8] to enter into th[e] [EPA] and consummate the transactions contemplated by th[e] [EPA]."[43]

---

[39] *Id.* ¶ II.B.2.

[40] *Id.* ¶ II.C.24; JX 63 ("EPA"); *see* JX 71 at 1.

[41] SPD Newco was an entity created and controlled by Castanon to effectuate the sale of Symbient, and the Castanon Family Trust was the sole stockholder of SPD Newco. *See* JX 63. Randi Castanon is Scott Castanon's spouse. PTO ¶ II.A.3. For clarity, I will refer to Scott Castanon as "Castanon" and Randi Castanon by her full name.

[42] As a technical matter, SPD Newco received the consideration. PTO ¶ II.C.25; EPA § 2.1.

[43] EPA § 6.8(e).

Section 6.8(a) of the EPA is a non-compete provision. It prohibits Castanon from "directly or indirectly . . . engag[ing] in or assist[ing] others in engaging in" a "Restricted Business" in a defined "Territory" for a period of five years.[44] It also restricts him from having "an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity," including as an "agent" or "consultant."[45] It further bars him from "intentionally interfer[ing] in any material respect with the business relationships (whether formed prior to or after the date of [the EPA]) between [Symbient] and customers or suppliers of [Symbient]."[46] "Restricted Business" is defined as "contract design engineering and

---

[44] *Id.* § 6.8(a). The full text of the provision is:

> For a period of five (5) years commencing on the Closing Date (the "Restricted Period"), neither of the Seller [SPD Newco], the Stockholder [the Castanon Family Trust] or Castanon shall, and none of them shall permit any of their Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company and customers or suppliers of the Company.

The "Company" is defined as Symbient. *Id.* at Preamble.

[45] *Id.* § 6.8(a).

[46] *Id.*

10

manufacturing of medical and life science devices."[47] The "Territory" is "the United

States of America."[48]

The EPA contains non-solicit provisions that apply during a five-year "Restricted Period."[49] Section 6.8(b) prohibits Castanon from "directly or indirectly, "hir[ing] or solicit[ing] any employee of [Symbient] or encourag[ing] any such employee who has left such employment," with certain limitations.[50] Section 6.8(c) prohibits Castanon from "directly or indirectly, solicit[ing] or entic[ing], or attempt[ing] to solicit or entice, any clients or customers of [Symbient] or potential

---

[47] *Id.* § 10.1(a). The EPA also provides: "For avoidance of doubt, 'Restricted Business' shall not include any business which provides contract design engineering and manufacturing services solely with respect to products other than medical and life science devices." *Id.*

[48] *Id.*

[49] "Restricted Period" is defined as the "period of five (5) years commencing on the Closing Date." *Id.* § 6.8 (a).

[50] *Id.* § 6.8(b). The full text of the provision is:

> During the Restricted Period, neither of Seller [SPD Newco], Stockholder [the Castanon Family Trust] or Castanon shall, and none of them shall permit any of their Affiliates to, directly or indirectly, hire or solicit any employee of the Company or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 6.8 shall prevent Seller, Stockholder, Castanon or any of their Affiliates from hiring (i) any employee whose employment has been terminated by the Company or Purchaser or (ii) after one hundred eighty (180) days from the date of termination of employment, any employee whose employment has been terminated by the employee.

11

clients or customers of [Symbient] for purposes of diverting their business or services from [Symbient]."[51]

Section 9.2 of the EPA states that Castanon will be personally liable for a breach of the restrictive covenants in the EPA or "any ancillary agreement."[52]

### D.     The Operating Agreement

Under Section 7.1(i) of the EPA, Castanon, through SPD Newco, was also required to enter into an operating agreement with Gener8's parent company, G8 Holdings.[53]   Because Castanon received units in G8 Holdings, he signed the Amended and Restated Operating Agreement of G8 Holdings LLC (the "Operating

---

[51] *Id.* § 6.8(c).  The full text of the provision is:

> During the Restricted Period, neither of Seller [SPD Newco], Stockholder [the Castanon Family Trust] or Castanon shall, and none of them shall permit any of their Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or potential clients or customers of the Company for purposes of diverting their business or services from the Company.

[52] *Id.* § 9.2.  The relevant provision provides that:

> [T]he Seller [SPD Newco], the Stockholder [the Castanon Family Trust], and the Trust Grantors [Castanon and Randi Castanon] shall jointly and severally indemnify [Gener8] and its Affiliates and . . . hold them harmless from and against any and all Losses incurred or suffered . . . resulting from, arising out of or related to any . . . breach of any covenant or agreement of [Symbient] or [SPD Newco], [the Castanon Family Trust] or Castanon contained in th[e] [EPA] or any ancillary agreement to which the Company or the Seller, Stockholder or Castanon are a party that are required to be performed by any of them . . . .

[53] *Id.* § 7.1(i).

12

Agreement") as a "Member."[54]  In that capacity, Castanon was subject to an additional non-compete covenant prohibiting him from "engag[ing] in or possess[ing] interests in any such business that may be deemed to be in competition with any Portfolio Company."[55]  The "Portfolio Compan[ies]" are G8 Holdings' "operating subsidiaries," including Symbient and Gener8.[56]

The Operating Agreement gave Castanon the right to observe meetings of G8 Holdings' board of the managers (the "Board") and receive certain Board materials.[57]  Castanon was obligated to "hold in confidence and trust and to act in a fiduciary manner with respect to all information" given to him as a Board observer.[58]

## E.    Castanon's Termination

After the transaction closed, Gener8 and Symbient worked to add manufacturing capabilities to Symbient's business.[59]  Doing so was part of Gener8's investment thesis for Symbient.[60]  In November 2020, Symbient drafted a

---

[54] As a technical matter, SPD Newco received the G8 Holdings units, became a "Member," and executed the Operating Agreement.  *Id.* (requiring SPD Newco to execute the Operating Agreement); JX 61 ("Operating Agreement"); *see* JX 71 at 1.

[55] Operating Agreement § 4.2.

[56] *Id.* § 1.4; *see* PTO ¶ II.B.1.

[57] Operating Agreement § 3.12(b).

[58] *Id.*

[59] *See* Helm Tr. 73; Castanon Tr. 244; Jurkiewicz Tr. 695; JX 90; JX 186.

[60] JX 44 at 16-17.

Manufacturing Transition Quality Plan, which contemplated "turnkey design, development, manufacturing and servicing solutions for final devices."[61]

For a time post-closing, Castanon remained at the helm of Symbient and managed its day-to-day operations.[62] But in March 2021, Jerry Jurkiewicz joined Gener8 as CEO; Castanon was President.[63] On April 21, 2021, Jurkiewicz terminated Castanon as President due to his distaste for Castanon's management style.[64] Jurkiewicz hoped to find Castanon a different role within Symbient.[65]

Castanon took the news poorly and refused to discuss other job positions.[66] His employment at Symbient formally ended on May 21, 2021.[67] Castanon was terminated without cause under a provision in his employment agreement.[68]

---

[61] JX 126 at 4.

[62] PTO ¶ II.C.38; JX 64 (describing Castanon's role as "President" of Symbient).

[63] Finley Tr. 36.

[64] Jurkiewicz Tr. 675-76 ("Q. And why did you remove him [Castanon] from that role? A. Culture. He abused employees. And it was a pervasive sentiment in my one-on-ones. It was described as a culture of fear in my first visit by two separate people."); *see also id.* at 677; Finley Tr. 34-36; Ceriani Tr. 463 (testifying that Castanon "could be difficult as a manger" and that he would easily "get mad" at and "be impatient" with employees).

[65] Jurkiewicz Tr. 675.

[66] *Id.* at 677-79; Castanon Tr. 256-58.

[67] PTO ¶ II.C.39.

[68] JX 64 § 6(a). Castanon suspects that Sverica and Gener8 wanted to oust him from Symbient—even before the acquisition closed. Sverica and Gener8 had discussed and planned for the possibility that Castanon would not be part of Symbient in the future. *See* JX 58; JX 59; JXs 86-87. But there is no evidence (other than Castanon's testimony about

## F. The Unit Repurchase

After leaving Symbient, Castanon sought to liquidate his membership interest in G8 Holdings.[69] He told Jurkiewicz that he "want[ed] his money out" because Gener8 was "going down the tubes."[70] Castanon and G8 Holdings negotiated a repurchase of Castanon's units over the ensuing months.

By May 18, 2021, Castanon sought to exercise his Board observer rights.[71] He had not received Board materials for (or even notice of) a scheduled May 27 meeting.[72] After Castanon reached out, the G8 Holdings Board discussed how to "shield[] stuff from him."[73] G8 Holdings wanted to "excise anything that shows growth" and any other information that Castanon "w[ould] use to justify an above-

---

his beliefs) that there was a premeditated plan to oust him. Finley and Jurkiewicz credibly testified otherwise. Finley Tr. 34-36; Jurkiewicz Tr. 674-75.

[69] Castanon Tr. 402-04; Jurkiewicz Tr. 677; *see* JX 161 at 2 ("[Scott] said he wanted his money out.").

[70] JX 166 at 1; Jurkiewicz Tr. 677; *see* Castanon Tr. 403-04.

[71] JX 192 at 4.

[72] JX 201; *see also* JX 192.

[73] JX 192 at 1.

cost share price."[74]  The Board meeting agenda was "revise[d]" to "account for [Castanon's] attendance."[75]  Castanon chose not to attend this Board meeting.[76]

On June 24, Castanon made an offer to sell his G8 Holdings units for $9,440,000.[77]  G8 Holdings counteroffered at $5,250,000.[78]

On August 11, Castanon again sought to exercise his Board observer rights.[79]  He had received neither materials for nor notice of an August 20 meeting.[80]  The Board "sanitize[d]" the materials given to Castanon and planned to meet without him to discuss "sensitive topics."[81]  G8 Holdings was especially concerned with discussing the company's planned M&A activity in Castanon's presence.[82]

---

[74] JX 196 at 1.

[75] *See* JX 199 at 1 ("I don't want to play this game more than once where we are modifying the Board agenda, but I do not think we can speak about the company's standing and prospects openly with Scott on the call."); *see also* JX 198; JX 200; JX 201 ("Please revise the agenda to account for Scott's attendance this Thursday and distribute."); JX 203.

[76] Hylant Tr. 732.

[77] JX 216 at 1.

[78] JX 234 at 2-3.

[79] JX 239 at 1.

[80] *See id.*; JX 255.

[81] JX 257; JX 253.

[82] JX 250 ("We should probably reserve M&A for the exec session since we're talking valuation."); JX 251; JX 254; *compare* JX 255 (version of the board meeting slide deck circulated to Castanon), *with* JX 238 (an earlier draft).

Castanon attended the August Board meeting.[83] The Board discussed a bleary financial outlook for the company, including a downgraded EBITDA forecast.[84] Afterward, one Board member told another that "if [Castanon] was resistant to a deal before, [the information presented] just might push him to sell."[85]

Three days after the Board meeting, on August 23, Castanon accepted the $5,250,000 counteroffer.[86] One Board member remarked: "I guess the last meeting did the trick."[87] About a week later, on September 3, Gener8 executed a letter of intent to acquire a medical device software development company.[88] G8 Holdings sought to "clear [Castanon] out ASAP before he change[d] his mind."[89]

On October 8, Castanon and G8 Holdings entered into a Unit Repurchase Agreement, through which G8 Holdings repurchased Castanon's G8 Holdings units for $5,250,000.[90] Castanon ceased to hold any equity interests in G8 Holdings or

---

[83] *See* JX 258.

[84] *See e.g.*, JX 261; JX 577 at 18.

[85] JX 259.

[86] JX 264.

[87] JX 265.

[88] JX 275.

[89] *Id.* at 1; JX 276 ("When can we buy-back Scott's shares?"; "Immediately."); JXs 277-79.

[90] PTO ¶ II.C.61; JX 304.

Gener8.[91]  Thus, he was no longer bound by the Operating Agreement, which lacks a survival clause.  As to the EPA, Castanon "acknowledge[d], confirm[ed] and agree[d] to abide by the obligations contained in the [EPA], including, without limitation, those [restrictive covenants] set forth in Section 6.8."[92]

## G.    Protoshop's Formation

In July 2021—two months after Castanon's departure from Symbient—a company called Protoshop, Inc. was formed.  Castanon's stepson James "Jimmy" Isaacs purports to be Protoshop's founder.[93]  Isaacs was employed by Symbient from October 2006 to October 2021 as a machinist.[94]  When Isaacs left Symbient in October 2021, he held the position of machine shop supervisor.[95]

In June or July 2021, Isaacs asked Castanon for "help" with Protoshop.[96] Castanon agreed.[97]  Castanon "provided substantial startup help."[98]

---

[91] PTO ¶ II.C.62.

[92] JX 304 at 4.

[93] Isaacs Tr. 170-71.  Isaacs did not testify live at trial.  His deposition testimony was played during trial as contemplated by the pre-trial order.  *See* PTO ¶ V.D.

[94] PTO ¶ II.B.5.

[95] *Id.*

[96] Isaacs Tr. 171-72; *see* Castanon Tr. 268.

[97] Castanon Tr. 268.

[98] *Id.* at 351.

At the same time, Isaacs approached Symbient's Principal Engineer about joining Protoshop and offered him a 25% stake in the business.[99] He declined. Isaacs next approached Dylann Ceriani, Symbient's Director of Engineering, with the same offer.[100] Ceriani accepted, wanting to fulfill her longstanding desire to start a business.[101] Isaacs and Ceriani planned to own Protoshop 75%/25%.[102] Ceriani did not contribute any capital in exchange for her 25% stake.[103] Nor did Isaacs for his 75% stake.[104]

## H. Financing from Isaacs' "Rich Uncle"

Around June or July 2021, Protoshop received a $400,000 interest-free loan for startup financing. Isaacs told Ceriani and others that the funds were from his "rich uncle."[105] Ceriani was led to believe that an uncle named "Bob" was the funding source.[106] She even backed up Isaacs story when he told Symbient upon

---

[99] Isaacs Tr. 183-85; *see also* PTO ¶ II.B.12.

[100] Ceriani Tr. 483; Isaacs Tr. 185-86; *see also* PTO ¶ II.B.6.

[101] Ceriani Tr. 483, 491- 92; *see* Isaacs Tr. 185-86.

[102] Isaacs Tr. 199.

[103] Ceriani Tr. 486.

[104] Isaacs Tr. 199; *see* Ceriani Tr. 486-87.

[105] Ceriani Tr. 486-87, 558; *see* Helm Tr. 109; Isaacs Tr. 178-82. To the extent Isaacs averred that he received less than $200,000 from his "rich uncle," his testimony is neither credible nor supported by the broader record. *Cf.* Isaacs Tr. 180-81.

[106] Ceriani Tr. 486-87, 560; *id.* at 558 (trying to recall if the uncle's name was "Bob"); Ceriani Dep. 61 ("Bob is what comes to mind, but I don't know if that's right.").

resigning that Castanon was not involved in Protoshop and that a "rich uncle" was financing the business.[107] Unbeknownst to Ceriani, Isaacs' story was a lie.[108]

During his deposition, Isaacs refused to identify the uncle, citing "financial privacy rights."[109] He would only say that the lender was his father's brother and that his "rich uncle's" spouse had worked for an affiliate of Verisign Inc.[110] This testimony was easily disproven. The plaintiffs deposed Isaacs' uncle (Robert Isaacs), who confirmed that his spouse once worked for a Verisign affiliate.[111] But Robert Isaacs confirmed that he did not loan or gift money to Isaacs.[112] Isaacs' only other uncle (James Isaacs) worked in the nuclear engineering field; neither he nor his spouse were ever affiliated with Verisign.[113]

Who, then, could the mysterious "rich uncle" bankrolling Protoshop be? The overwhelming weight of the evidence suggests that it was Castanon. Castanon has

---

[107] Ceriani Dep. 61-69; Ceriani Tr. 485-86; *see* Isaacs Dep. 55, 85; JX 297; JX 542.

[108] Ceriani did not know Isaacs was lying to her about the source of the financing. *See* Ceriani Tr. 560. Ceriani was the most credible witness at trial and seemed appropriately concerned about Isaacs' apparent mistruths.

[109] Isaacs Tr. 179-80.

[110] *Id.* at 180-81.

[111] Robert Isaacs Tr. 225 (testifying that Isaacs never asked him for money). For clarity, I refer to Jimmy Isaacs as "Isaacs" and to Robert Isaacs by his full name. Robert Isaacs did not testify live at trial. His deposition testimony was played during trial pursuant to the pre-trial order. *See* PTO ¶ V.D.

[112] Robert Isaacs Tr. 224-25.

[113] *Id.* at 229.

a close personal relationship with Isaacs and an expansive knowledge of the plastic injection molding industry. He made over $9 million in cash from selling Symbient just before Protoshop received startup funds in June 2021.[114] After losing his senior position at the company he founded, he had a motive to cause it harm. He also had a motive to hide his involvement, given the restrictive covenants in the EPA.

## I.       Protoshop's Launch

Castanon's assistance to Protoshop was not only financial. He also agreed to help with "[a]nything that [Isaacs] needed."[115] He (in his own words) "work[ed] around the clock for months" to "get Protoshop started."[116]

In July 2021, Castanon filed California corporate formation documents for Protoshop.[117] A Statement of Information filed with the Secretary of State of California on July 15 identifies Isaacs as Protoshop's Chief Executive Officer and Director, and Ceriani as its Chief Financial Officer and Director.[118] Protoshop's

---

[114] Castanon denied being the "rich uncle." *See* Castanon Tr. 408-09, 416-17. He was not credible—in no small part since he was caught in other lies at trial. *See infra* Section II.A. Castanon admitted to later providing financing in April and May 2022. *See infra* Section I.L. This timing distinction seems self-serving since it could affect Castanon's potential liability under the EPA if he improperly solicited Isaac and Ceriani to leave Symbient.

[115] Castanon Tr. 268.

[116] JX 686 at 171.

[117] PTO ¶¶ II.C.40-41; JX 224.

[118] PTO ¶ II.C.42; JX 224.

Articles of Incorporation and Statement of Information identify Castanon as its "Agent" for service of process.[119]

In August 2021, Castanon scouted out and secured office space for Protoshop—less than a mile away from Symbient's office in Carlsbad, California.[120] He signed and personally guaranteed the lease for Protoshop's office.[121] He made Protoshop's initial lease payment of $28,075.[122]

Castanon's "substantial startup help"[123] did not end there. He set up Protoshop's logo,[124] website,[125] email domain and email accounts,[126] computer systems,[127] mold design software,[128] office electricity,[129] and health insurance

---

[119] PTO ¶ II.C.42.

[120] *See* PTO ¶¶ II.C.51-52; Helm Tr. 82, 88; JX 17 at 1; JX 242.

[121] PTO ¶ II.C.52.

[122] PTO ¶ II.C.53; JX 242.

[123] Castanon Tr. 351; *see also id.* at 400 ("I've said many, many times, I helped them get started.").

[124] PTO ¶ II.C.44.

[125] *Id.* ¶ II.C.48; Ceriani Tr. 506 (testifying that Castanon did most of the work on the website).

[126] PTO ¶ II.C.46.

[127] *Id.* ¶ II.C.54; JX 433; JX 475.

[128] PTO ¶ II.C.47.

[129] *Id.* ¶ II.C.49.

plans.[130]  He also ordered business equipment for Protoshop using his personal funds, totaling over $160,000 dollars.[131]

Protoshop officially opened on November 1, 2021.[132]  It had five employees: Isaacs, Ceriani, Jennifer Taylor (Symbient's former Office Manager from September 2015 to October 2021), Randi Castanon, and Scout Ceriani (Ceriani's daughter).[133] Isaacs, Ceriani, and Taylor had resigned from their positions at Symbient just a few weeks earlier.[134]  Ceriani, in particular, was viewed as a major loss to Symbient.  She was named a "Key Employee" in the EPA and considered a "unicorn" engineer given her talent, diverse skill set, and customer skills.[135]

Symbient and Gener8 became suspicious.  On October 7, their attorney reached out to Castanon's counsel, questioning whether Castanon was complying with his non-compete and non-solicit obligations.[136]  Two days later, on October 9, Castanon texted Ceriani: "They [plaintiffs] might sue me as they get frustrated with

---

[130] *Id.* ¶ II.C.55.

[131] *Id.* ¶ II.C.50; *see* JX 248; JX 271; JX 340; JXs 398-400, JX 407; JX 418; JXs 426-28; JX 433; JX 445; JX 466; JX 475; JX 705 at 191, 202, 248, 331; JX 707 at 30-31; JX 733; Castanon Tr. 364-65, 380.

[132] Isaacs Tr. 189; Ceriani Tr. 499.

[133] PTO ¶¶ II.B.7, 17; Ceriani Tr. 499; Castanon Tr. 348-49.

[134] PTO ¶¶ II.C.58-59, 65.

[135] EPA § 10.1(a); Helm Tr. 106; Ceriani Tr. 548; Jurkiewicz Tr. 703; *cf.* Castanon Tr. 434-35.

[136] PTO ¶ II.C.60.

employees leaving but I don't think they would win."[137] On October 14, Castanon's counsel denied Castanon's involvement and wrote that he was "<u>not</u> providing financing to the new company."[138]

## J. Protoshop's Business

Protoshop aims to provide rapid, high quality prototype molding services to clients in the life science and medical industries.[139] Protoshop's work is focused on a subset of the Symbient development cycle phases—principally, Phase 3.[140] As Ceriani put it, "Protoshop's business model is to fabricate molds and to mold parts, and that's it."[141]

As a first step in its workflow, Protoshop offers optional "[part] design assistance."[142] This process is similar to Phases 1 and 2 of Symbient's development cycle.[143] But unlike Symbient, which creates products of assembled parts, Protoshop focuses on designing (and molding) unassembled parts.[144]

---

[137] JX 309 at 2.

[138] PTO ¶ II.C.64.

[139] JX 547; JX 642; JX 645; JX 530 at 9 (showing Protoshop's development process).

[140] Helm Tr. 88, 121-22, 146; Ceriani Tr. 467-68, 471, 535-36; Isaacs Tr. 176.

[141] Ceriani Tr. 502; *see also* Castanon Tr. 264-65, 267, 411; Isaacs Tr. 176; *but see* Helm Tr. 113 (noting that Protoshop also designs and manufactures molds).

[142] JX 530 at 9.

[143] *See* Helm Tr. 152-53.

[144] Ceriani Tr. 502; Castanon Tr. 264; Isaacs Tr. 176.

Some Protoshop customers skip the design assistance step and come to Protoshop with a prepared CAD model of the part.[145] In that case, Protoshop conducts a "moldability review" to confirm that the part can be molded.[146] The moldability review often results in changes to the mold design and, thus, the part design.[147] Protoshop views the moldability review as giving it an edge on "molding-only" firms.[148] It can make modifications faster and cheaper than most companies that solely mold parts.[149]

### K. Protoshop's Customers

Protoshop had its first customer by mid-November 2021.[150] To secure more, Castanon promoted Protoshop on social media. In December, Castanon asked his LinkedIn contacts—including former, current, and potential customers of Symbient—to "follow Protoshop" on LinkedIn and visit Protoshop's website.[151] He

---

[145] *See* Isaacs Tr. 176-77; Ceriani Tr. 496-97, 502-04, 535-36, 538.

[146] Ceriani Tr. 472-74, 538-41; Castanon Tr. 264-65 (describing the "moldability report"); JX 530 at 5 ("Part moldability review to confirm parts are molding-ready."); JX 347.

[147] Ceriani Tr. 473-74.

[148] *Id.* at 502-04; JX 347.

[149] Ceriani Tr. 502-04; JX 347.

[150] Ceriani Tr. 500; Castanon Tr. 415-16.

[151] JX 686 at 122-85; *see* Helm Tr. 99-101 (confirming these contacts included former, current, and potential customers of Symbient).

explained that Protoshop was started by "former Symbient workers" he was "mentoring."[152]

Castanon boasted to contacts that "[Protoshop's] prototype molds are fabricated quickly within a few days and part quality is far better than any service out there," encouraging his contacts to "refer anyone you know that might have a need for prototype molding."[153] In one direct message, he wrote: "I sold my mold making method along with Symbient but I came up with something better for Protoshop."[154] In another, he said "I sold the molding method along with the company so I had to create something new. I came up with a method . . . even better than before."[155]

In March 2022, Castanon sent out another blast message to his LinkedIn contacts: "I just launched a new take on mold fabrication (ProtoShopInc) that means prototype molds getting fabricated in 3-5 days and mold iterations within 1-2 days."[156] Castanon urged his contacts to reach out so that he could "give [them] a glimpse at how we are solving some of the biggest headaches I dealt with all those

---

[152] JX 686 at 122-85.

[153] *Id.*

[154] *Id.* at 130.

[155] *Id.* at 170.

[156] *Id.* at 2, 4-6, 9-121, 188.

years on the client side of the table."[157]  One request for a referral said: "After I sold [Symbient], I started Protoshop."[158]

The comparisons to Symbient in advertising Protoshop did not end there. Protoshop's marketing materials and website featured images of parts and products that Symbient had designed for its own customers.[159]

In time, Protoshop began to service a number of Symbient's former, current, and prospective clients. Common customers include ProteoWise Inc., Coagulo Medical Technologies, Inc., and DeviceLab Inc.[160]

### L.  Castanon's Additional Financial Support of Protoshop

In February 2022, Castanon personally guaranteed and signed approximately $150,000 of equipment loans for two milling machines for Protoshop.[161]  In securing the loan, Castanon told the lender: "I've taken over the shares in Protoshop for 75% of the company that were owned by James Isaacs.  It's been officially changed with the state.  I was acting as advisor to the company but I've stepped in as president."[162]

---

[157] *Id.*

[158] *Id.* at 117.

[159] *Compare* JX 17 (images of a microfluidic diagnostics cartridge and DNA cartridges on Symbient's marketing materials), *with* JX 530 at 11 (same images of microfluidic diagnostics and DNA cartridges on Protoshop's business overview slide presentation); *see also* Helm Tr. 94-98.

[160] *See infra* Section II.B.3.

[161] PTO ¶ II.C.72.

[162] JX 437.

Castanon had, in fact, filed a new Statement of Information with the State of California identifying himself as Protoshop's Chief Executive Officer and Director.[163]  But Isaacs never transferred his 75% ownership to Castanon.[164]

Castanon's financial support of Protoshop continued throughout the spring. In March 2022, Castanon personally guaranteed another $90,000 equipment loan for a molding machine.[165]  On April 14 and May 4, 2022, Castanon made two interest-free loans ($50,000 and $100,000) to Protoshop.[166]  Castanon testified that he made the loans to Isaacs.[167]  But Ceriani confirmed that the funds were deposited in Protoshop's accounts.[168]

### M.    Gener8's Cease-and-Desist Letter

In March 2022, two other Symbient employees—Marcio Lupercio and Deserie Ancheta—joined Protoshop.[169]  Lupercio had been with Symbient since

---

[163] PTO ¶¶ II.C.70-71; JX 430.

[164] *See* Isaacs Tr. 202-03; Castanon Tr. 271-73.

[165] PTO ¶ II.C.73; JX 468.

[166] PTO ¶ II.C.74; Castanon Tr. 274-76.

[167] Castanon Tr. 337-38.

[168] Ceriani Tr. 555.

[169] PTO ¶¶ II.B.8-9.

March 2018, and Ancheta since August 2021.[170]  At the time of their departures, Lupercio was Molding Supervisor and Ancheta was a machinist.[171]

On April 21, 2022, Gener8's attorney sent Castanon's counsel a cease-and-desist letter.[172]  The letter stated that Castanon's involvement with Protoshop and solicitation of Gener8 employees and customers violated the restrictive covenants in the EPA.[173]  The letter told Castanon that Gener8 was contemplating litigation and to "preserve all property" in his possession, including electronic information, about his "affiliation with Protoshop, its formation, and its business."[174]

### N.    This Litigation

On May 16, 2022, Symbient and Gener8 filed a Verified Complaint in this court, along with a motion for expedited proceedings and a motion for a temporary restraining order.[175]  The parties agreed to resolve the motions through a stipulated

---

[170] *Id.*

[171] *Id.*

[172] *Id.* ¶ II.C.75; JX 514.

[173] JX 514.

[174] *Id.* at 8.

[175] Dkts. 1-3.  On October 3, 2022, the plaintiffs filed a similar action against Protoshop in California Superior Court.  *See Gener8, LLC v. Protoshop Inc.*, Case No. 37-2022-00039503-CU-PT-CTL (Cal. Super. Ct.).

29

Consent Order, which I entered on May 27.[176]  Broadly speaking, the Consent Order prohibited Castanon from assisting Protoshop while this action was pending.[177]  On October 20, the plaintiffs agreed to lift the Consent Order when they requested a continuance of the trial.[178]

On October 10, the plaintiffs filed a Verified Amended Complaint (the "Complaint").[179]  The Complaint advances five claims against Castanon.  Count I is a claim for breach of the restrictive covenants in the EPA.[180]  Count II is a claim for breach of the implied covenant of good faith and fair dealing.[181]  Counts III and IV are claims for intentional interference with contractual relations and with prospective economic advantage, respectively.[182]  And Count V is a claim for breach of fiduciary duty as a former Gener8 employee and G8 Holdings Board observer.[183]

A three-day trial was held from January 30 to February 1, 2023.[184]  After trial, the plaintiffs moved for sanctions based on spoliation and violations of the Consent

---

[176] Consent Order (Dkt. 14).

[177] *Id.* ¶ 2.

[178] Dkt. 77.

[179] Verified Am. Compl. (Dkt. 69) ("Compl."); *see* Dkt. 63 (granting leave to amend).

[180] Compl. ¶¶ 123-40.

[181] *Id.* ¶¶ 141-45.

[182] *Id.* ¶¶ 146-69.

[183] *Id.* ¶¶ 170-76.

[184] Dkts. 135-38.

Order.[185]   After post-trial briefing and argument, this matter was submitted for decision as of June 16.[186]

## II.   LEGAL ANALYSIS

I begin my analysis by resolving the plaintiffs' motion for sanctions.   I conclude that Castanon is in contempt of the Consent Order and recklessly spoliated evidence.  As remedies, I draw certain adverse inferences and award the plaintiffs their reasonable fees and costs in connection with the sanctions motion.

I go on to evaluate the merits of the plaintiffs' claims.  The plaintiffs proved that Castanon breached the non-compete and non-solicit provisions of the EPA (Count I).  They failed to prove their other claims (Counts II through V).  The plaintiffs are entitled to $104,356.00 in damages plus pre-judgment interest, injunctive relief requiring Castanon to abide by his restrictive covenants, and their reasonable attorneys' fees and costs.

### A.   Sanctions

The plaintiffs moved for sanctions against Castanon under Court of Chancery Rules 37(e) and 70(b).[187]   They argue that sanctions are appropriate to remedy Castanon's violation of the Consent Order and spoliation of evidence.  Because

---

[185] Pls.' Mot. for Sanctions (Dkt. 145) ("Sanctions Mot."); *see also* Dkts. 150, 153.

[186] Dkts. 162, 164.  Post-trial briefing included a sur-reply that I permitted Castanon to file. *See* Dkts. 159, 160.

[187] Sanctions Mot. 3, 18; *see* Ct. Ch. R. 37(e); Ct. Ch. R. 70(b).

Castanon's actions were egregious, at least reckless, and prejudicial, sanctions are appropriate.

### 1. Contempt

"Court of Chancery Rule 70(b) authorizes the court to find a party in contempt for the failure 'to obey or to perform any order.'"[188] "To establish civil contempt, [the petitioning party] must demonstrate that the [alleged contemnors] violated an order of this Court of which they had notice and by which they were bound."[189] The petitioning party must "establish the contemptuous conduct by a preponderance of the evidence."[190] The plaintiffs have met this burden.

The Consent Order was entered by the court on May 27, 2022 and remained in effect until October 20, 2022.[191] Castanon had notice of the Consent Order. It was negotiated and signed by his counsel and expressly referenced Castanon's

---

[188] *In re Aerojet Rocketdyne Hldgs, Inc.*, 2022 WL 2180240, at *21 (Del. Ch. June 16, 2022) (quoting Ct. Ch. R. 70(b)).

[189] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *15 (Del. Ch. Dec. 9, 2009) (quoting *Arbitrium v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009)) (alterations in original), *aff'd*, 26 A.3d 180 (Del. 2011).

[190] *TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 644 (Del. 2022) (quoting *Wilm. Fed'n of Tchrs. v. Howell*, 374 A.2d 832, 838 (Del. 1977)) (cleaned up).

[191] Dkts. 14, 76, 77.

agreement to its terms.[192]  Castanon also acknowledged his awareness of the Consent

Order at trial.[193]

The Consent Order prohibited Castanon from: (1) engaging in, assisting or

being "involved with providing any advice, consulting services, or any other services

of any kind" to Protoshop; and (2) providing "financial support to Protoshop" while

this action is pending.[194]  Castanon meaningfully violated these provisions by

actively overseeing and paying for work on Protoshop's website.[195]

Just two days after the Consent Order was entered, Castanon provided detailed

feedback on 26 action items to Protoshop's website developer.[196]  Castanon

continued for weeks to work with the developer on Protoshop's website.[197]  On June

---

[192] Dkts. 13, 14; Consent Order at Recitals, Signature Page.

[193] Castanon Tr. 288.

[194] Consent Order ¶¶ 2, 3.  The plaintiffs also contend that Castanon violated the Consent Order's prohibition on directly or indirectly taking steps to promote or advance the commercial or business interests of Protoshop.  *See id.* ¶ 7.  In support, they cite two LinkedIn communications.  *See* JX 686 at 1, 2.  Neither message suggests that Castanon meaningfully solicited customers or promoted Protoshop after the Consent Order was in place.  *See inTEAM Assocs., LLC v. Heartland Payment Sys., LLC*, 2021 WL 5028364, at *8 (Del. Ch. Oct. 29, 2021) (explaining that, to support a contempt finding, a "violation must not be a mere technical one but must constitute a failure to obey the Court in a meaningful way").

[195] *TransPerfect*, 278 A.3d at 644 ("When an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way.").

[196] JX 561 at 6.

[197] *Id.*; JX 575.

14, 2022, Castanon paid a $2,000 invoice to the website developer out of his "personal account."[198]

Castanon knowingly violated the Consent Order through these actions. At trial, Castanon initially suggested that he transitioned the website work to Ceriani.[199] Perhaps recognizing that none of his email exchanges with the website developer so much as copied Ceriani,[200] Castanon changed tack. He then testified that he was aware of the Consent Order's requirements but believed that completing work on Protoshop's website was "the least of the two evils."[201] Indeed, his "higher morals" compelled him to pay the website developer's invoice.[202]

This is no excuse for Castanon's conduct. If morality truly moved Castanon, he could have sought a modification of the Consent Order.[203] His testimony shows that he understood the meaning of the Consent Order and decided to disobey it by engaging in the very conduct it barred.[204]

---

[198] JX 566.

[199] Castanon Tr. 294.

[200] JX 559; JX 561; JX 566; JX 575; Castanon Tr. 294-98.

[201] Castanon Tr. 309.

[202] *Id.*

[203] Consent Order ¶ 8.

[204] *inTEAM Assocs.*, 2021 WL 5028364, at *8 ("This court has also noted in considering a motion for contempt that 'the Court must be satisfied that there was an 'element of willfulness or conscious disregard of a court order.'").

## 2. Spoliation

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[205] Castanon likely could have anticipated litigation as early as October 7, 2021, when the plaintiffs' counsel raised "concerns on the part of Gener8 about [Castanon's] compliance with his non-compete and related obligations."[206] By October 9, there is no doubt that Castanon anticipated litigation—he told Ceriani that he believed the plaintiffs "might sue" him.[207] Castanon had, by this point, already violated his restrictive covenants by putting the groundwork for Protoshop in place, providing financing for Protoshop, and encouraging Isaacs and Ceriani to leave Symbient.[208] Castanon understood that the plaintiffs might accuse him of being "in violation of the agreement" (i.e., the EPA) if he "[g]ave [Isaacs] the money or [] was involved with the new company."[209]

---

[205] *TR Invs.*, 2009 WL 4696062, at *17 (quoting *Beard Rsch. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. May 29, 2009)).

[206] JX 314; *see Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *29 (Del. Ch. July 22, 2015) (finding that a defendant "had reason to anticipate litigation" "at the latest, when he began communicating with his attorney" "about possible allegations by [the plaintiff] that [the defendant] was breaching his noncompetition obligations").

[207] JX 309 at 2; *see* Castanon Tr. 346 (admitting that, as of October 9, he knew there was a "possibility" the plaintiffs might sue him).

[208] *See supra* notes 117, 120-31 and accompanying text. *See also infra* notes 311, 314-19 and accompanying text.

[209] JX 309 at 2.

Despite anticipating litigation in October 2021, Castanon failed to preserve electronic evidence.[210] He did not disable the auto-delete function on his email until April 21, 2022.[211] Worse, Castanon never stopped deleting his texts (even after receiving Gener8's cease and desist letter).[212] Castanon produced just 12 individual text messages—none of which were with Ceriani, Isaacs, or Taylor.[213]

Ceriani's text messages, which were not produced until the month of trial, are among the most damning evidence in the case. They prove that Castanon routinely texted with her, Isaacs, Taylor, and Protoshop customers.[214] The texts reveal that Castanon coordinated the timing of Isaacs' and Ceriani's resignations from Symbient.[215] They also show that Castanon was working directly with certain former Symbient customers.[216]

---

[210] *See* JX 598 at 20-26; Castanon Tr. 315-17.

[211] Castanon Tr. 315-17. The plaintiffs argue that Castanon continued to delete emails. They only identify a single gap in Castanon's production after April 21, 2022: an email between Castanon and Coagulo that Coagulo produced and Castanon did not. JX 487. This could have been a production oversight and is not enough to find that Castanon spoliated emails post-April 21. *See* Castanon Tr. 284-85; JX 593 at 2-3.

[212] Castanon Tr. 322-23.

[213] JX 687.

[214] *See, e.g.*, JX 243; JX 246; JX 286; JX 292; JX 309; JX 374; JXs 434-35.

[215] JX 296.

[216] JXs 434-35.

Since Castanon deleted his texts, the record is devoid of messages sent between Castanon and Isaacs (save one), or Castanon and Symbient customers, that excluded Ceriani. In other words, unless Ceriani was a part of the text chain with Castanon, relevant texts were (mostly) not produced. The prejudice to the plaintiffs is obvious; the extent of the prejudice is unknown since the text messages are irretrievably lost.

Castanon's deletion of text messages was at least reckless. To warrant dispositive sanctions, a party must "intentionally or recklessly destroy[] evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item."[217] "Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled."[218] "Intentional destruction simply means that the spoliator acted 'with purpose.'"[219]

---

[217] *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006); *see Beard Rsch.*, 981 A.2d at 1192 ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction . . . ."); Ct. Ch. R. 37(e)(2).

[218] *TR Invs.*, 2009 WL 4696062, at *17 (citing *Beard Rsch.*, 981 A.2d at 1192).

[219] *Id.*

This is not a situation where Castanon negligently forgot to turn off auto-delete.[220]  Instead, he displayed blatant disregard for his duty to preserve evidence, compounded by a lack of candor.  During his November 2022 deposition, Castanon maintained that he is "not a texter."[221]   He said that he will "reply if somebody's texting [him]," but "prefer[s] to talk to people."[222]  When Ceriani produced her text messages two months later, Castanon was caught in a lie.[223]  Castanon is, in fact, a prolific texter.  He regularly texted about Protoshop—including with Ceriani, Isaacs, Taylor, and Protoshop customers (such as DeviceLab).[224]  The vast majority of texts produced by Ceriani were missing from Castanon's meager production.[225]

Although Castanon's failure to preserve email is less egregious, it was likewise reckless.  Castanon testified that he set up a Gmail account after leaving Symbient and was unaware that deleted emails became permanently lost since his

---

[220] That is not to say that no remedy would be appropriate if Castanon permitted the automatic deletion of messages.  *See Twitter, Inc. v. Musk*, 2022 WL 5078278, at *5 (Del. Ch. Oct. 5, 2022).  Rather, his state of mind goes beyond negligence.

[221] Castanon Dep. 113.

[222] *Id.*; *see also* Castanon Tr. 318 (repeating the same refrain).

[223] *See* Pls.' Opening Post-trial Br. (Dkt. 144) 15; *compare* JX 687 (all messages Castanon produced), *with* JX 705 (all messages Ceriani produced).

[224] *See, e.g.*, JX 243; JX 246; JX 286; JX 292; JX 309; JX 374; JXs 434-35.

[225] JX 705 at 340-72; *see also id.* at 188-372 (Ceriani's production post-dating October 9, 2021, including text messages received and sent by Castanon).  Castanon only produced a single text with Isaacs.  *See* Castanon Tr. 321.

business account had preserved them.[226]  Given his other false and self-serving testimony on data preservation, I find it difficult to believe him.  Moreover, he took the affirmative act of deleting emails when he knew he was under a duty to preserve evidence.

At trial, Castanon tried to use his spoliation to his advantage.  For example, when questioned on the first day of trial about the circumstances of Taylor's departure, Castanon testified unequivocally that he "didn't talk to [Taylor] after [he] left [Symbient] at all."[227]  On the second day of trial, Castanon doubled down, saying that he "was surprised" to discover Taylor working at Protoshop when he visited the office.[228]  Yet, Castanon's text messages—which were only available from Ceriani's last-minute production—show that Castanon was fully aware of Taylor's plan to resign from Symbient and join Protoshop.[229]  More strikingly, Castanon's testimony at trial (like at his deposition) was that he is not a "big texter" and, when he does text, it's "in reply to people that text" him to "play along."[230]  Hundreds of texts

---

[226] *See* Castanon Tr. 284-85; JX 593 ¶ 4; JX 598 at 20-26 (admitting in interrogatory responses that Castanon moved relevant emails to the "Trash" folder which were then "automatically" deleted after 30 days).  Notably, Castanon's interrogatory responses make no mention of texts.

[227] Castanon Tr. 278.

[228] *Id.* at 390.

[229] JX 296 at 2.

[230] Castanon Tr. 286, 318.

produced by Ceriani prove otherwise.[231]  Castanon's shifty testimony suggests that he deleted texts (and perhaps emails) to cover his tracks.

### 3. The Appropriate Sanctions

The plaintiffs seek sanctions against Castanon under Rule 70(b) for violations of the Consent Order and under Rule 37(e) for spoliation.  "Rule 70(b) supplies this court with the power—and broad latitude—to remedy violations of its orders."[232] "A trial judge has broad discretion to impose sanctions for failure to abide by its orders" provided the sanctions are "just and reasonable."[233]  Rule 37(e) allows the court to make an adverse inference or enter a default judgment "upon finding prejudice to another party from loss of information" and when a " party acted recklessly or with the intent to deprive another party of the information's use in the litigation."[234]

"Sanctions serve three functions: a remedial function, a punitive function, and a deterrent function."[235]  With these purposes in mind, the court considers the offending party's culpability, the complaining party's prejudice, and the availability

---

[231] *See, e.g.*, JX 310; JX 454; JX 628; JX 630; JX 705.

[232] *TR Invs.*, 2009 WL 4696062, at *15; *see* Ct. Ch. R. 70(b).

[233] *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE).

[234] Ct. Ch. R. 37(e).

[235] *Beard Rsch.*, 981 A.2d at 1189.

of lesser sanctions to avoid unfairness while serving as a deterrent.[236] The recklessness of Castanon's conduct and the resulting prejudice to the plaintiffs is addressed above. That leaves the matter of tailoring an appropriate remedy "to the degree of culpability of [Castanon] and the prejudice suffered by" the plaintiffs.[237]

I decline to grant a default judgment. "Entry of a judgment against the spoliating party should be regarded as 'a last resort.'"[238] "[A] motion for such relief should be 'granted only if no other sanction would be more appropriate under the circumstances.'"[239] This extreme sanction is unwarranted here, after a full trial was conducted where the plaintiffs were able to adduce substantial alternative evidence to prove their case in chief.[240]

The lesser sanction of adverse inferences is, however, warranted for Castanon's spoliation. The Delaware Supreme Court has explained that:

---

[236] *Id.* ("[T]he Court will consider the following factors in determining the appropriate sanctions: (1) the culpability or mental state of the party who destroyed the evidence; (2) the degree of prejudice suffered by the complaining party; and (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the conduct in the future.").

[237] *Id.* at 1189-90.

[238] *Id.* at 1190; *see TR Invs.*, 2009 WL 4696062, at *19.

[239] *Beard Rsch.*, 981 A.2d at 1190; *see TR Invs.*, 2009 WL 4696062, at *19.

[240] *Cf. BDO USA, LLP v. EverGlade Glob., Inc.*, 2023 WL 1371097, at *14 (Del. Super. Jan. 31, 2023) (awarding a default judgment where there was "no direct evidence" for the plaintiff's case in chief and because "[t]o prove [their case], [plaintiff] should not have to rely on circumstantial evidence, which [wa]s all that [wa]s left").

41

An adverse inference instruction is appropriate where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item.[241]

That is the situation here. Castanon recklessly destroyed evidence. He then sought to capitalize on his misconduct by providing false testimony at trial. Accordingly, I draw limited adverse inferences that the lost information would support findings that Castanon solicited Symbient employees and customers.[242] The specific inferences that I deem appropriately tailored to address Castanon's culpability and the resulting prejudice to the plaintiffs are noted in my analysis of the plaintiffs' claims below.

As a sanction for contempt of the Consent Order, Castanon must pay the fees and expenses incurred by the plaintiffs' counsel in moving for sanctions.[243] Doing so will serve a remedial purpose: the plaintiffs will not be forced to bear the costs of bringing Castanon's contumacious behavior to light and will be given some

---

[241] *Midcap*, 893 A.2d at 552.

[242] *See, e.g., Beard Rsch.*, 981 A.2d at 1192 (drawing an adverse inference where the defendant deleted information, replaced his hard drive, and failed to maintain the original despite receiving prior notice that the data could be discoverable); *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *8 (Del. Ch. May 18, 2009) (drawing adverse inferences where the defendant deleted files on his work computer and failed to preserve data on a thumb drive and home computer containing relevant information), *aff'd*, 988 A.2d 938 (Del. 2010); *Kan-Di-Ki* , 2015 WL 4503210, at *28-30 (drawing "narrowly tailored [adverse] inferences" where the defendant failed to preserve text messages that could have contained evidence of his alleged breaches of restrictive covenants).

[243] *See infra* note 244 and accompanying text.

recompense for his actions.[244]  This sanction is also appropriate due to Castanon's spoliation.  "To impose monetary sanctions, this Court need only find that a party had a duty to preserve evidence and breached that duty . . . ."[245]

## B.    Breach of Contract

The plaintiffs contend that Castanon breached the non-competition provisions in the EPA and Operating Agreement and the non-solicitation provisions in the EPA. As an initial matter, Castanon objects to the plaintiffs' attempt to hold him liable for breaching the Operating Agreement since no such claim is in the Complaint.  His objection is well placed.[246]

The Complaint advances a breach of contract claim based on the EPA alone.[247] The plaintiffs aver that they may nonetheless pursue relief under the Operating

---

[244] *See Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4804792, at *3 (Del. Ch. Sept. 26, 2014) ("When dealing with alleged civil contempt, sanctions should only 'be directed towards coercing compliance with the order being violated and remedying the injury suffered by other parties as a result of the contumacious behavior.'" (quoting *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1188 (Del. Ch. 2009))); *see also Isr. Disc. Bank of N.Y. v. First State Depository Co., LLC*, 2013 WL 2326875, at *28 (Del. Ch. May 29, 2013) ("An award of counsel fees is also a proper consideration for civil contempt.") (cleaned up); *Bruckel v. TAUC Hldgs., LLC*, 2023 WL 4583575, at *14-16 (Del. Ch. July 17, 2023) (awarding attorneys' fees as a sanction for the defendant's contempt of a court order requiring the production of certain books and records); *Aveta*, 986 A.2d at 1188 (awarding attorneys' fees where the defendant was found in contempt of a court order mandating arbitration).

[245] *Beard Rsch.*, 981 A.2d at 1194.

[246] The plaintiffs have not moved to supplement the Complaint under Rule 15(d).

[247] Am. Compl. ¶¶ 123-40.

Agreement as an "ancillary agreement" to the EPA.[248]  This argument is, however, based on a tortured reading of the EPA, which does not expressly mention the Operating Agreement.[249]  In any event, the plaintiffs waited until the eve of trial to claim that Castanon breached the non-compete provision in the Operating Agreement.[250]  Castanon lacked prior notice of this possibility.  Tellingly, the Amended Complaint addresses the EPA 44 times but does not mention the Operating Agreement once.[251]  The plaintiffs' attempt to raise violations of a separate agreement with a different non-compete provision came too late.[252]  Thus, I only consider whether Castanon breached the restrictive covenants in the EPA.

---

[248] *See* PTO ¶ VI.2.

[249] *See* EPA § 9.2 (addressing indemnification for breaches of "ancillary agreements"). The EPA does not expressly incorporate the Operating Agreement's terms—or even mention the Operating Agreement.  To invoke Section 9.2 in the first place, the plaintiffs would need to prove a breach of the Operating Agreement (assuming it is an "ancillary agreement" to the EPA).  But they neglected to press a claim for breach of the Operating Agreement.

[250] The plaintiffs first raised this theory in a draft pre-trial order on January 12, 2023.  PTO ¶ VI.5.

[251] Am. Compl. ¶¶ 7-8, 12, 26-29, 33-34, 37-40, 43-44, 82, 88, 101, 103, 114, 116, 119-20, 124-34, 139, 142-45, 151, 163.

[252] *See Zutrau v. Jansing*, 2014 WL 6901461, at *7 (Del. Ch. Dec. 8, 2014) ("Pleadings are intended to provide fair notice to the opposing party of the legal and factual theories and claims to be litigated."), *aff'd*, 123 A.3d 938 (Del. 2015).  Had the plaintiffs moved to amend the Complaint under Rule 15(d), I would have denied their request because of the prejudice to Castanon.  *See Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *9 (Del. Ch. May 21, 2008) (denying a request to amend under Rule 15(a) where the "belated addition" of a claim "would cause undue prejudice" to the non-movant), *aff'd*, 962 A.2d 916 (Del. 2008).  Castanon was deprived of the opportunity to answer and pursue discovery (including expert discovery)

44

The parties agree that Delaware law applies to the EPA, which contains a Delaware choice of law provision.[253] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[254] The plaintiffs bear the burden of proving these elements "by a preponderance of the evidence."[255]

"Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[256] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the

related to a purported violation of the Operating Agreement. *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) ("The general rule . . . that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance."); *Zhou v. Deng*, 2022 WL 1024809, at *6 (Del. Ch. Apr. 6, 2022) ("Arguments that are not raised until pre-trial briefing or after may be deemed waived by the Court. By that time, the opposing party has already shaped his trial plans, and it is simply too late and unfair to expect him meaningfully to confront the arguments so close to (or after) trial." (citing *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012))), *aff'd*, 287 A.3d 633 (Del. 2022).

[253] Def.'s Pre-trial Br. (Dkt. 134) 41-42; Pls.' Opening Pre-trial Br. (Dkt. 121) ("Pls.' Pre-trial Br.") 23; EPA § 10.8; *see also* Operating Agreement § 11.6 (applying Delaware law). The EPA also provides that "any claim" relating to the agreement would "be brought solely in [the] Delaware Court of Chancery." EPA § 10.6(a).

[254] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[255] *Zimmerman v. Crothall*, 62 A.3 676, 691 (Del. Ch. 2013).

[256] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

agreement.'"[257]  The court must construe the contract "as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[258]

With these principles in mind, I turn to the EPA provisions at issue.

### 1.  Engaging in a Restricted Business

Section 6.8(a) of the EPA prohibits Castanon from "directly or indirectly" "engag[ing] in" a "Restricted Business in the Territory" or "assist[ing] others in engaging in the Restricted Business in the Territory" for five years.[259]  Castanon does not challenge the enforceability of the restrictive covenant or the reasonableness of its scope.[260]  The parties' dispute centers on (1) whether Protoshop is a "Restricted Business" and, if so, (2) whether Castanon was "directly or indirectly" engaging in or assisting with it.

---

[257] *Salamone*, 106 A.3d at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[258] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[259] EPA § 6.8(a).

[260] Pls.' Pre-trial Br. 30-32; Def.'s Pre-trial Br. 41 ("[T]he Restrictive Covenants in the EPA fall within the exception set forth in Cal. Bus. & Prof. Code § 16601, relating to the sale of a business."); *see id*. at 43-44, 46 n.16; Def.'s Post-trial Br. (Dkt. 151) 19.

### a. Whether Protoshop is a "Restricted Business"

The EPA defines "Restricted Business" to mean "contract design engineering and manufacturing of medical and life science devices."[261] Castanon insists that Protoshop does not fall within this definition because it neither design engineers nor manufactures such devices.[262] For the most part, his arguments reduce to nothing more than "persistent definitional smoke bombs" that obfuscate both the nature of Symbient's and Protoshop's businesses and the concept of "design engineering."[263] After clearing away the smoke, it is apparent that Protoshop contract design engineers medical and life science devices. It is a Restricted Business.

### i. Conjunctive or Disjunctive "And"

A threshold question is whether the word "and" in the phrase "contract design engineering and manufacturing" is conjunctive or disjunctive.[264] That is, must a Restricted Business engage in both design engineering *and* manufacturing? Or can

---

[261] EPA § 10.1(a).

[262] Def.'s Post-trial Br. 20-22. The plaintiffs' post-trial reply brief also asserts that Protoshop was a "manufacturer." *See* Pls.' Post-trial Reply Br. (Dkt. 155) 17-19. This argument is missing from their opening post-trial brief, amounting to a waiver. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001). Regardless, the notion that Protoshop was a "manufacturer" because it fabricated prototype molds is inconsistent with the notion that Symbient did not engage in manufacturing pre-acquisition.

[263] *See* Jurkiewicz Tr. 695.

[264] EPA § 10.1(a).

a Restricted Business provide either design engineering *or* manufacturing services? Castanon invokes the former approach while the plaintiffs take the latter.

"[A]lthough 'and' typically bears a conjunctive meaning, that presumption can be overcome by context."[265] "[C]ourts interpret 'and' in the disjunctive sense to prevent an absurd or unreasonable result, or to give effect to the parties' intent and reasonable expectations."[266] Here, a disjunctive interpretation of "and" is supported by context and the absurdity that would result from a conjunctive reading.

At the time of its acquisition by Gener8, Symbient did not engage in contract manufacturing.[267] Construing "and" conjunctively would therefore exclude Symbient from the scope of the EPA's noncompete.[268] It would have been illogical

---

[265] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1045 (Del. 2023); *see also Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) ("[T]he word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings.").

[266] *Weinberg*, 294 A.3d at 1045 (rejecting a "joint" interpretation of "and" that would produce an "absurd or unreasonable result"); *see, e.g.*, *Slodov v. United States*, 436 U.S. 238, 250 (1978) (construing "and" as used in Section 6672 of the Internal Revenue Code as disjunctive); *Peacock*, 252 F.2d at 895 (construing "and" disjunctively in the Fair Labor Standards Act). An example raised at trial highlights the point: "[I]f you asked me . . . what kind of fruit do you like? And I say, I like apples and bananas, you don't infer that I like apples and bananas together. I like apples, or, separately, I like bananas." Finley Tr. 28.

[267] *See supra* notes 17, 33 and accompanying text. One can imagine an argument that the restrictive covenant is overbroad if it included services Symbient did not provide at the time of contracting. *See Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *8 (Del. Ch. Oct. 6, 2022) ("In the context of a sale of a business, the acquirer has a legitimate economic interest with regard to the assets and information it acquired in the sale."). No such argument was raised by either party.

[268] *See* Finley Tr. 25-26; Hylant Tr. 715; *cf. supra* note 267 and accompanying text.

for Gener8 to define the term Restricted Business to exclude the very business it was acquiring.

Further, when the EPA was being negotiated, the parties expected that Symbient would achieve manufacturing capabilities in the future.[269] Post-closing, Symbient worked to add "contract manufacturing" as an additional, elective option to its development process.[270] When that process was complete, Symbient's customers could choose "contract design engineering" *or* "contract manufacturing" *or* both. As such, it is reasonable that Gener8 bargained for a definition of Restricted Business that included "design engineering" *or* "manufacturing."

### ii. "Design Engineering"

The next step is construing the meaning of "contract design engineering" in the definition of Restricted Business.[271] The word "contract" means contracting with and performing services for third party clients.[272] Protoshop undoubtedly provided

---

[269] *See supra* note 60 and accompanying text.

[270] *See supra* notes 59, 61 and accompanying text.

[271] The word "contract" modifies both "design engineering" and "manufacturing." *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) ("Under conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012))); *see also* Pls.' Post-trial Reply Br. 14-16; Def.'s Pre-trial Br. 44 n.15.

[272] Pls.' Opening Post-trial Br. 27; Pls.' Post-trial Reply Br. 15; Def.'s Post-trial Br. 44-45 n.19; *see also Contract*, Merriam-Webster, https://www.merriam-webster.com/dictionary/contract (last visited Sept. 26, 2023) (defining "contract" as "to establish or undertake by contract," "to hire by contract," and "to purchase (goods, services, etc.) on a

contract services to its customers.[273]  Whether those services were "design engineering" is less straightforward.

Although the parties advance different interpretations of the phrase "design engineering," neither argues that the phrase is ambiguous.[274]  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[275]  "Clear and unambiguous language . . . should be given its ordinary and usual meaning."[276]  "But where a word has attained the status of a term of art

---

contract basis"); *see also Contract*, Cambridge Dictionary, https://dictionary. cambridge.org/us/dictionary/english/contract (last visited Sept. 26, 2023) (defining "contract" as "to make a legal agreement with someone to do work or to have work done for you").

[273] *See infra* notes 281, 333-34 and accompanying text (noting that Protoshop performs part design and prototype molding services and offers these services to customers who are in the medical device and life sciences fields).

[274] *See, e.g.*, Pls.' Pre-trial Br. 37 ("[A] Restricted Business includes a company that contracts with customers to engineer the design of their medical or life science devices, including molds and prototypes of those devices or components of devices."); Def.'s Post-trial Br. 4 ("Trial proved Symbient is a contract design engineering firm specializing in the design and development of prototypes of disposable medical and life sciences devices: it designs and develops medical/life science devices (from the concept stage) through its engineers, whose billable hours constitute Symbient's primary source of revenue."); *id.* at 17 ("Trial proved that the definition of 'Restricted Business' is tied to Symbient, which is a contract design engineering firm specializing in medical and life sciences devices: it designs medical/life science devices (from the concept stage) through its engineers, whose billable hours constitute Symbient's primary source of revenue.").

[275] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[276] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."[277]

As a general matter, the term "design" means "to create, fashion, execute, or construct according to plan."[278] "Engineering" typically means "to lay out, construct, or manage as an engineer."[279] More technically speaking, according to the McGraw-Hill Dictionary of Scientific and Technical Terms, "design engineering" is "[a] branch of engineering concerned with the creation of systems, devices, and processes useful to and sought by society."[280]

---

[277] *Viking Pump, Inc. v. Liberty Mut. Ins. Co*., 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) (citing *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 8 (N.Y. App. Div. 2006)).

[278] *Design*, Merriam-Webster, https://www.merriam-webster.com/dictionary/design (last visited Sept. 26, 2023).

[279] *Engineer*, Merriam-Webster, https://www.merriam-webster.com/dictionary/engineer (last visited Sept. 26, 2023). As a noun, "engineer" means "a person who is trained in or follows as a profession a branch of engineering." *Id.*

[280] *Design engineering*, McGraw-Hill Dictionary of Scientific & Technical Terms (5th ed., 1994). Engineering textbooks provide a similar description of design engineering. *See Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *3 (Del. Ch. Feb. 16, 2011) (consulting textbooks to determine the "ordinary meaning" of an unambiguous contractual term). For example, one textbook describes design engineering as a "set of decision-making processes and activities used to determine the form of an object given the functions desired by the customer." Rudolph J. Eggert, Engineering Design 2 (2005). Other professional journals and textbooks are in accord. *See* Clive L. Dym et al., *Engineering Design Thinking, Teaching, and Learning*, 94 J. Eng'g Educ. 103, 104 (2005) ("Engineering design is a systematic, intelligent process in which designers generate, evaluate, and specify concepts for devices, systems, or processes whose form and function achieve clients' objectives or users' needs while satisfying a specified set of constraints."); Arvid R. Eide et al., Engineering Fundamentals and Problem Solving 79 (4th ed., 2002) ("Engineering design is a systematic process by which solutions to the needs

The trial record demonstrates that Protoshop provides such services. Protoshop advertises its "optional" "[p]art design assistance," touting that its "engineers have extensive plastic part design experience over thousands of parts" and stand "ready to help [customers] develop a part design that meets [their] requirements."[281] Customers seeking part design assistance come to Protoshop with an idea and "desired needs and specifications with constraints."[282] Protoshop then engages in part design and creates the accompanying mold and tangible plastic parts that meet the customer's specifications.

Some Protoshop customers skip the part design assistance step. But even when a customer comes to Protoshop with an initial design in hand, Protoshop often modifies it during a moldability review.[283] Moldability review is an iterative process: as the mold evolves, so does the part design, which affects the mold that, in

---

of humankind are obtained. . . . The design process is applied to problems (needs) of varying complexity.").

[281] JX 530 at 9; JX 645 at 2; JX 549 at 4 ("[W]e created Protoshop with the goal that we are going to provide plastic part design and material selection assistance to better ensure that our customers yield parts that are going to be successful in their application.").

[282] *Criteria for Accrediting Engineering Programs*, Accreditation Board for Engineering and Technology 4 (2019), https://www.abet.org/accreditation/accreditation-criteria/criteria-for-accrediting-engineering-programs-2020-2021/.

[283] *See* JX 406 (Castanon: "Just once I'd like to see CAD models that don't need changes."); Ceriani Tr. 540-41.

turn, affects the part.[284] Thus, mold design—including moldability review—is a type of design engineering. The key difference between mold design and part design assistance is that in the former case, the customer comes to Protoshop with more developed specifications.

Castanon offered the testimony of Dr. Richard Anderson to refute this conclusion. Anderson opined that "design engineering would be encompassed in Phases 1 and 2" of Symbient's five-phase development cycle.[285] According to Anderson, Protoshop did not provide design engineering because it only performed Phase 3 tasks. But Anderson's interpretation of "design engineering" is at odds with the plain meaning of the phrase.[286] Symbient's process was just one possible implementation of the design engineering process.[287] Regardless, even under

---

[284] JX 530 at 5 ("Mold iterations encouraged as the design evolves[.]"); *id.* at 9 ("Request rapid mold iterations as needed[.]"); JX 645 at 2 ("Rapid mold iterations": "Our molds are intended to allow for quick iterations to part geometry, typically in just 1 day.").

[285] Anderson Tr. 855-58; *see also* JX 663 at 24 (stating that "without completing all of the deliverables and tasks completed from [Phases 1 and 2], one cannot be said to have performed Design Engineering").

[286] *See supra* note 280. Insofar as Anderson is testifying about contract interpretation, I give it no weight. *See United Rentals, Inc. v. RAM Hldgs., Inc.*, 2007 WL 4465520, at *1 (Del. Ch. Dec. 13, 2007) ("This Court . . . has made it unmistakably clear that it is improper for witnesses to opine on legal issues governed by Delaware law."). Anderson's testimony must also be viewed in the context of his longstanding relationship with Castanon. The two are co-inventors on a medical device patent. Anderson Tr. 870-71.

[287] *See*, *e.g.*, Clive L. Dym & Patrick Little, Engineering Design: A Project-Based Introduction 26 (John Wiley & Sons 2d ed. 2004).

Anderson's interpretation, Protoshop engages in design engineering when it advises clients on changes to their CAD models.[288]

### iii. "Medical and Life Science Devices"

The phrase "medical and life science devices" is the final part of the Restricted Business definition.[289] "Medical" means "of, relating to, or concerned with physicians or the practice of medicine."[290] "Life sciences" means "a branch of science (such as biology, medicine, and sometimes anthropology or sociology) that deals with living organisms and life processes."[291] It is undisputed that Protoshop

---

[288] *See* Ceriani Tr. 473, 529-30, 539-41. At trial, Castanon testified that mold design and moldability review were not design engineering because "the responsibility for the design changes stays with the customer." Castanon Tr. 264-65; *see also* Ceriani Tr. 472. The weight of the evidence, however, shows that Protoshop controlled mold design, which affected part design. *E.g.*, JX 663 at 29 ("Mold design review feedback falls into two categories: 1) changes that are mandatory in order to proceed with mold fabrication; and 2) changes that are optional, but which are recommended to reduce the risk of molding defects."). Part and mold design generally changed during moldability review. Ceriani Tr. 473-74; JX 406 at 2.

[289] EPA § 10.1(a).

[290] *Medical*, Merriam-Webster, https://www.merriam-webster.com/dictionary/medical (last visited Sept. 26, 2023); *see also Medical*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/medical (last visited Sept. 26, 2023) (defining "medical" as "related to the treatment of illness and injuries").

[291] *Life science*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ life%20sciences (last visited Sept. 26, 2023); *see also Life science*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english /life-science?q=life+sciences (last visited Sept. 26, 2023) (defining "life science" as "one of the types of science that deal with the structure and behavior of living things, such as botany, zoology, biochemistry, and anthropology").

worked with medical and life science customers.[292]  Finally, a "device" is "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function."[293]  Prototype parts and prototype molds fall within that definition.

Anderson testified that the reference to "medical devices" in the definition of Restricted Business refers to "finished medical devices" as defined by the Food and Drug Administration (FDA).[294]  He opined that "finished medical devices" do not include parts of devices, molds, or prototypes.[295]  But there is no evidence that the EPA incorporates FDA regulatory definitions.  The FDA is unmentioned in the EPA.[296]  Moreover, according to Anderson, the FDA also does not define "life sciences devices" or regulate them.[297]

---

[292] *See* JX 530 at 3, 11; *infra* notes 334, 341 and accompanying text.

[293] *Device*, Merriam-Webster, https://www.merriamwebster.com/dictionary/device (last visited Sept. 26, 2023); *see also Device*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/device (last visited Sept. 26, 2023) (defining "device" as "an object or machine that has been invented for a particular purpose").

[294] JX 663 at 13; *see also* JX 631; Anderson Tr. 827-28.

[295] JX 663 at 12-13; Anderson Tr. 836, 883-84.  Anderson acknowledged that his interpretation of "medical device" would mean that Restricted Business excludes Symbient's business at the time of the acquisition when it did not make finished medical devices. Anderson Tr. 886-88.  Adopting Anderson's interpretation would therefore render the definition of Restricted Business absurd.  *See supra* notes 267-69 and accompanying text.

[296] Anderson Tr. 883-84.

[297] *Id.* at 884.

b. Whether Castanon "Directly or Indirectly" Engaged in or Assisted With Protoshop's Business

The evidence of Castanon's direct and indirect involvement in Protoshop is overwhelming. Castanon admitted that he gave "substantial" startup assistance to Protoshop.[298] He filed Protoshop's corporate formation documents, set up Protoshop's email accounts and web domain, researched health insurance plans for Protoshop employees, sought out and ordered equipment, and secured office space.[299] His own contemporaneous messages confirm his involvement and repeatedly take credit for Protoshop.[300] Through these actions, he violated Section 6.8(a)(i) of the EPA.[301]

---

[298] Castanon Tr. 350-51 ("I didn't say I didn't have involvement with [Protoshop]. I completed approximately—my guess is that I helped set up about 20 percent of their startup tasks. I mean, I provided substantial startup help."); *see id.* at 400 ("I've said many, many times, I helped them get started. I helped them with startup tasks."); *id.* at 401 ("No, I'm not in the background. I'm here in text messages. I'm interacting with vendors. There's nothing hidden here. I helped them. I admitted I helped them."); *id.* at 438-39 (discussing a text message sent from Castanon to Ceriani where he noted "[t]oday I'm working on website content for phase 1.5 and providing information for [search engine optimization], [pay per click] and social media"); *see also id.* at 280, 376, 398.

[299] *See supra* Section I.I.

[300] *See supra* notes 156-58 and accompanying text; *see also* JX 686 ("After 20+ years in the molding business, I just launched a new take on mold fabrication (ProtoShopInc) that means prototype molds getting fabricated in 3-5 days and mold iterations within 1-2 days. I'm reaching out to get connected with engineers as I build out ProtoShop. Love to give you a glimpse at how we are solving some of the biggest headaches I dealt with all those years on the client side of the table.").

[301] *See, e.g.*, *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *19 (Del. Ch. Sept. 1, 2023) (describing a restrictive covenant barring a party from "directly or indirectly" engaging in competitive activity as "broad" and noting that "[a]ctivities undertaken in an effort to prepare a product to compete constitute an activity indirectly competitive with [the

Castanon also breached Section 6.8(a)(ii) because he "directly or indirectly" has "an interest in [a] Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity."[302] Arguably, Castanon had a direct financial interest in Protoshop. He personally took on the lease for Protoshop's office,[303] guaranteed equipment loans for Protoshop,[304] and made thousands of dollars of purchases for Protoshop using his own funds.[305] Regardless, Castanon has a "direct or indirect interest" in Isaacs (his stepson and the recipient of a substantial loan from Castanon as the "rich uncle"), who owns 75% of Protoshop. [306]

*          *          *

Protoshop is a Restricted Business that Castanon took part in. Castanon's hyper-technical arguments to the contrary are belied by both the text of the contract and common sense. The evidence shows that Protoshop serves as a partial market

---

company]"); *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *9, *14 (Del. Ch. Apr. 15, 2004) (holding that a former employee "indirectly competed with" his former employer "by assisting in the development of a company offering services substantially similar to those offered by" the former employer); *Kan-Di-Ki*, 2015 WL 4503210, at *21 (concluding that a defendant violated a restrictive covenant barring him from "engag[ing] directly or indirectly in all or any portion of the Business" where the defendant indirectly competed by helping the third-party company transition away from the plaintiff's services to other vendors).

[302] EPA § 6.8(a)(ii).

[303] PTO ¶ II.C.52.

[304] *Id.* ¶¶ II.C.72-73.

[305] *See supra* note 131 and accompanying text.

[306] *See* Castanon Tr. 321, 335-37; *see also* PTO ¶ II.C.74.

substitute for many of Symbient's services.[307] Protoshop provides an approach that shortened both the "on ramp" and "off ramp" for Symbient projects.[308] Protoshop's efforts to participate in the same business as Symbient is especially apparent from its use of Symbient product images to advertise for its services.[309] Plainly, Protoshop aims to provide the same products to clients in the same industries as Symbient.

Castanon admittedly provided extensive assistance to Protoshop. He led efforts to establish Protoshop as a business and set up its physical space. He repeatedly provided financial assistance. And he has an interest in Isaacs by way of a substantial loan. Accordingly, Castanon breached Section 6.8(a) of the EPA.

### 2. Solicitation of Employees

Section 6.8(b) of the EPA prohibits Castanon from "directly or indirectly" "hir[ing] or solicit[ing] any employee of [Symbient] or encourag[ing] any such employee to leave such employment or hir[ing] any such employee who has left such employment."[310] At the very least, Castanon breached this provision by encouraging Isaacs, Ceriani, and Taylor to leave Symbient.[311]

---

[307] Helm Tr. 120-21; JX 122 (estimating $1.3 million from "prototype fabrication services"); JX 44 at 11 (estimating total revenue of $6.8 million).

[308] *See supra* notes 140-46 and accompanying text.

[309] *See supra* note 159 and accompanying text.

[310] EPA § 6.8(b).

[311] Castanon's actions can also be viewed as indirect solicitation of Ceriani and Isaacs. *See Solicit*, Merriam-Webster, https://www.merriam-webster.com/dictionary/solicit (last visited Sept. 26, 2023) (defining "solicit" as "to entice or lure"); *Solicit*, Cambridge

To "encourage" means to "attempt to persuade"[312] or "make someone more likely to do something."[313]  Although Isaacs and Ceriani said they left Symbient for Protoshop of their own volition,[314] the record demonstrates that Castanon was the instigator.  Castanon provided the financial means for Isaacs and Ceriani to leave Symbient.[315]  He also provided the necessary business support, involving himself in the mechanics of starting Protoshop.[316]

Castanon even coordinated the timing of Isaacs' and Ceriani's resignations. On October 1, Castanon texted Ceriani: "Jimmy needs to do stuff like set up machines and build the mold base so we needed him to quit today."[317]  Isaacs  quit

Dictionary, https://dictionary.cambridge.org/us/dictionary/english/solicit (last visited Sept. 29, 2023) (defining "solicit" as "to ask for something in a persuasive and determined way"); *see also Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *13, *23 (Del. Ch. June 20, 2019) (granting a motion for preliminary injunction against a defendant who was aided by several of the plaintiff's high ranking members in soliciting employees and coordinating their resignation from plaintiff); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *16 (Del. Ch. Jan. 17, 2007) (describing a defendant's conduct  assisting his new employer in soliciting his former "subordinates" as "easily fit[ting]" within the terms of restrictive covenants).

[312] *Encourage*, Merriam-Webster,           https://www.merriam-webster.com/dictionary/encourage (last visited Sept. 26, 2023).

[313] *Encourage*, Cambridge Dictionary,        https://dictionary.cambridge.org/us/dictionary/english/encourage (last visited Sept. 26, 2023).

[314] Isaacs Tr. 170, 175-76, 187-88; Ceriani Tr. 488-92.

[315] *See supra* Section I.I.

[316] PTO ¶¶ II.C.40, 45, 51-52.

[317] JX 296 at 2.

the same day.[318]  Castanon also advised Ceriani that she "may want to put [her resignation] in too" so that she could "take a week or two off as a break" and "come in refreshed."[319]

In addition, the documentary evidence proves that Castanon made it more likely that Taylor would leave Symbient.[320]  On October 1, Castanon texted Ceriani: "I think Jenn [Taylor] is quitting early next week because she wants a gap between jobs."[321]  On October 19—the day Taylor left Symbient—Castanon texted Ceriani to inform her of Taylor's health insurance status.[322]  Castanon clearly knew about and (at least indirectly) helped facilitate Taylor's resignation.

Finally, as to Lupercio and Ancheta, there is little evidence that Castanon either solicited them to join Protoshop or encouraged them to leave Symbient.  But given that Castanon knew Lupercio and knew of Ancheta from Symbient and was pulling the strings at Protoshop, it is reasonable to infer that deleted evidence would show he directly or indirectly solicited them.[323]  Castanon's lost texts with Isaacs,

---

[318] *Id.*

[319] *Id.*

[320] Castanon and Taylor testified to the contrary.  *See* Taylor Tr. 708; Castanon Tr. 278. Castanon's testimony is not credible.  And Taylor seems to have been unaware of Castanon's involvement behind the scenes.

[321] JX 296 at 2.

[322] JX 322.

[323] Castanon Tr. 432-33; *see* Pls.' Post-trial Reply Br. 7; *see supra* Section II.A.2-3.

for example, may have referenced these hires. I draw this adverse inference as a sanction for Castanon's spoliation.

### 3. Solicitation of Customers

Section 6.8(c) of the EPA prohibits Castanon from "directly or indirectly" "solicit[ing] or entic[ing], or attempt[ing] to solicit or entice, any clients or customers of [Symbient] or potential clients or customers of [Symbient] for purposes of diverting their business or services from [Symbient]."[324] Castanon breached this covenant in several ways.

First, he sent LinkedIn messages urging Symbient's former, current, and potential future customers to utilize Protoshop.[325] He described Protoshop as "new and improved" relative to Symbient and told potential clients that he had "create[d] something new . . . even better than before."[326]

Castanon also advised on Protoshop projects for current, former, or prospective Symbient clients:

- ProteoWise was and remains a Symbient customer.[327] Shortly after Protoshop opened, Symbient referred ProteoWise to Protoshop due to

---

[324] EPA § 6.8(c).

[325] *See supra* notes 151-58; *see also Anderson v. USI Advantage Corp.*, 2020 WL 1933803, at *3, *5 (N.D. Ga. Apr. 21, 2020) (concluding that corresponding with a former employer's customers on LinkedIn violated a non-solicit provision); *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 425, 432 (D.D.C. 2018) (holding that sending LinkedIn messages to a former employer's customers violated a non-solicit provision).

[326] JX 686 at 170-71.

[327] Helm Tr. 123; PTO ¶ II.B.20.

a production backlog.[328] Symbient did so believing that Castanon was uninvolved in Protoshop.[329] Castanon was, however, advising Ceriani on Protoshop's projects for ProteoWise.[330]

- DeviceLab is another former Symbient client—one that Castanon worked with while at Symbient.[331] After Castanon left Symbient, he remained in contact with DeviceLab.[332] At some point, DeviceLab became a customer of Protoshop.[333] In February 2022, Castanon exchanged text messages with a DeviceLab employee pertaining to Protoshop's work for DeviceLab.[334]

- Coagulo is a former (and potential future client) of Symbient.[335] After Castanon was fired from Symbient on April 21, 2021, Coagulo sought to hire him as a consultant so that he could continue working on Coagulo's project.[336] Symbient objected to the arrangement because

---

[328] Ceriani Tr. 505.

[329] Isaacs Dep. 85; Ceriani Dep. 91-92; Helm Tr. 115.

[330] PTO ¶ II.C.57; JX 503 (Castanon advising Ceriani on a "Proteowise OM gate" on April 13, 2022).

[331] JX 103; JX 692; Castanon Tr. 384. Castanon contends that the plaintiffs waived their claim with respect to DeviceLab. Not so. The plaintiffs' Complaint was broad enough to put Castanon on notice of the claim, without identifying specific customers. *See LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1454744, at *2 (Del. Ch. May 3, 2007) (denying a motion to exclude evidence of "new claims" or new "damages models" because the amended complaint alleged a "broad claim" and it "is only to be expected" that case theories will "evolve[] over the course of discovery"). Moreover, Castanon's spoliation prevented the plaintiffs from discovering evidence about DeviceLab earlier. The plaintiffs only discovered Protoshop's relationship with DeviceLab after the last-minute production of Ceriani's text messages. *See supra* Section II.A.2.

[332] Castanon Tr. 384-85.

[333] JX 434 at 2 (Castanon informing DeviceLab that the "[p]arts are on pace to finish by 4pm"); JX 435 (Castanon coordinating with DeviceLab for parts to be picked up).

[334] JX 434; JX 435; *cf.* Castanon Tr. 386-89 (testifying that he was simply handing over parts to the general manager of DeviceLab).

[335] JX 534.

[336] JX 174; JX 176; JX 180; JX 183; Castanon Tr. 258-59.

Castanon had yet to formally resign from Symbient.[337] Coagulo became increasingly frustrated with Symbient.[338] On the day after Castanon formally resigned, he signed a consultation agreement with Coagulo.[339] Consultation work on the specific project that Coagulo initially proposed never materialized.[340] Coagulo later became a customer of Protoshop[341] and worked directly with Castanon.[342]

- Sekisui was a prospective Symbient client.[343] Sekisui is a now Protoshop client. Castanon advised Ceriani on Protoshop's projects for Sekisui.[344]

Coupled with his LinkedIn messages, Castanon's work and advice on these projects

was a form of solicitation: enticing customers to use Protoshop over Symbient.[345]

---

[337] JX 174; JX 176; JX 180; JX 183.

[338] JX 174; JX 183 at 5.

[339] JX 185.

[340] JX 207.

[341] *See, e.g.*, JX 487.

[342] *Id.*

[343] *See* Helm Tr. 132-37; JX 256; JX 734; *see also* JX 482 (indicating that Symbient passed on a Sekisui project); JX 731; JX 734; JX 688; Ceriani Tr. 511 (explaining that Symbient had "turn[ed] [Sekisui's] business away").

[344] PTO ¶ II.C.57; JX 492 (Ceriani emailing Castanon because she "[n]eed[ed]" Castanon's "expertise" with a Sekisui project); JX 495 (Castanon advising Ceriani on a "Sekisui mold design question").

The plaintiffs also aver that Castanon solicited work from Biocrucible Ltd. and its sister company satio, Inc. The evidence suggests that Symbient's loss of these relationships was caused by its inability to meet deadlines and Ceriani's departure. Helm Tr. 115-16; Jurkiewicz Tr. 669-70; *cf.* Ceriani Tr. 547-50. It could be argued that these problems were caused by Castanon in the first place, but there is insufficient evidence to make that finding.

[345] Castanon contends that he did not divert Symbient's business or services to Protoshop because Symbient and Protoshop did not compete. In his view, Symbient and Protoshop served different customer needs, with Protoshop functioning as a "supplier" for Symbient.

The record is sufficient to support a finding that Castanon violated Section 6.8(c) of the EPA.[346] But to the extent that there are gaps in the record with regard to the customers discussed above, I infer that Castanon indirectly or directly solicited, enticed, or attempted to solicit or entice them. Since Ceriani's texts show Castanon's work for DeviceLab, Castanon may have directly texted with it and other Symbient customers. This adverse inference is a sanction for Castanon's spoliation.

### 4. Damages

As an element of their breach of contract claim, the plaintiffs must prove that Castanon's actions caused them damages.[347] The plaintiffs have shown that they were harmed by Castanon's breaches of the restrictive covenants in the EPA.[348] Among other things, Castanon created a competing business and solicited

---

Def.'s Post-trial Br. 25. As discussed above, the trial record shows otherwise. *See supra* notes 151, 159-60, 281-83 and accompanying text.

[346] *See Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *7 (Del. Ch. Sept. 28, 2018) (concluding that the defendant breached his employment agreement by helping to service and solicit customers from his former employer's "book of business"); *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *5-6 (Del. Ch. Aug. 9, 2004) (holding that the defendant breached her employment agreement by soliciting and performing services for her former employer's clients).

[347] *See Isr. Disc. Bank*, 2013 WL 2326875, at *11.

[348] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *16 (Del. Ch. Aug. 2, 2023) (explaining that a plaintiff has the burden to "demonstrate with 'reasonable certainty' that it was damaged by the challenged conduct" (quoting *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015))).

Symbient's customers and employees to it.  The quantum of the plaintiffs' damages is addressed later in this decision.[349]

## C.    The Plaintiffs' Remaining Claims

The plaintiffs' other claims fail.  For the most part, the plaintiffs have simply recast their contract claims using various legal theories.  Their distinct claims were given short shrift at trial.  Judgment is entered for Castanon on each.

### 1.    Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract.[350]  "The covenant is designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."[351]  It "does not apply when the contract addresses the conduct at issue."[352]

The plaintiffs' implied covenant claim cannot stand because the challenged conduct is governed by the EPA.  The facts underlying the plaintiffs' implied

---

[349] *See infra* Section II.E.3.

[350] *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-42 (Del. 2005).

[351] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *6 (Del. Ch. Feb. 3, 2009) (cleaned up).

[352] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 896 (Del. 2015); *see Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("The implied covenant cannot be invoked to override the express terms of the contract.").

covenant claim are the same implicated in the breach of contract claim.[353] The

plaintiffs concede as much, acknowledging that their implied covenant claim is

brought in the alternative.[354]

The plaintiffs point to one separate theory based on Castanon's purported

development of a "new and improved" molding method for Protoshop shortly after

leaving Symbient.[355] This vague argument is not, however, tied to any "specific

implied contractual obligation" or gap in the EPA.[356] Moreover, there is little

evidence about this purported molding method, including basic facts about what the

method is and when Castanon developed it.

## 2. Intentional Interference with Contractual Relations and with Prospective Economic Advantage

The plaintiffs also press claims for intentional interference with contractual

relations and intentional interference with prospective economic advantage. The

---

[353] *See* Pls.' Opening Post-trial Br. 38-39 (arguing that the plaintiffs were deprived of the fruits of their bargain because of competition, "draining Symbient's key employees," and customer solicitations).

[354] *Id.*

[355] *Id.* at 39; *see* JX 686 at 171.

[356] *Kuroda*, 971 A.2d at 888 ("[T]o state a claim for breach of the implied covenant, [the plaintiffs] 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998))). Nor is a gap identified in the Operating Agreement, which—again—was not mentioned in the Complaint. *See supra* note 249 (discussing waiver of claims based on the Operating Agreement).

parties agree (for different reasons) that Delaware law applies to the claims.[357]  Both

claims are deficient under Delaware law.

To prevail on a claim for tortious interference with contractual relations, the

plaintiffs must demonstrate the existence of "(1) a contract, (2) about which

defendant knew, and (3) an intentional act that is a significant factor in causing the

breach of such contract, (4) without justification, (5) which causes injury."[358]  The

plaintiffs aver that Castanon interfered with Symbient's relationships with customers

(including ProteoWise, Coagulo, and Sekisui) by soliciting them to Protoshop.[359]

But they have not proven the existence of specific contracts with such customers that

---

[357] Castanon argues that California law applies because California has the most significant relationship to the claims.  But he concedes that there is no material difference between California and Delaware law.  He briefed Counts III and IV under Delaware law.  Def.'s Pre-trial Br. 41-42.  The plaintiffs claim Delaware law applies because Counts III and IV are tort claims rooted in breaches of contracts governed by Delaware law.  Pls.' Pre-trial Br. 25-26.

[358] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).  California law likewise requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020).

[359] Pls.' Opening Post-trial Br. 41.

were breached.[360]  There is no proof of even a single contract between Symbient and its customers.  The claim fails on that basis alone.[361]

A claim for tortious interference with prospective economic advantage requires the plaintiffs to prove "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages."[362]  These factors "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[363]  As such, the plaintiffs "must prove that the defendant's conduct was wrongful independent of the interference.  Violations of statutory and

---

[360] *See* PTO ¶¶ II.B.19-21; Helm Tr. 123 (confirming that ProteoWise remains a Symbient customer); Jurkiewicz Tr. 693 (confirming that Coagulo is a Symbient customer).  No customers were deposed or testified at trial.

[361] The plaintiffs have also not proven that Castanon's intentional actions were a significant factor in causing a breach of any such contracts.  Nor have they attempted to prove resulting damages.

[362] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)).

[363] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (citation omitted).  California law is identical, requiring: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; [and] (3) intentional acts on the part of the defendant designed to disrupt the relationship." *Golden Eagle Land Inv., L.P. v. Rancho Santa Fe Ass'n*, 227 Cal. Rptr. 3d 903, 927 (Cal. Ct. App. 2018).  As in Delaware, the plaintiff must show "that the defendant committed an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 576 (Cal. 2020) ("[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.").

68

common law, as well as legal standards of behavior more broadly, satisfy the independent wrongfulness requirement."[364]

The plaintiffs argue that Symbient had a reasonable probability of future business opportunities with Symbient's current, former, and potential customers—including ProteoWise, Coagulo, Sekisui, DeviceLab, Biocrucible, and satio.[365] They proved that Castanon (directly or indirectly) solicited certain of these customers in breach of the EPA.[366] But they come up short in proving lost business opportunities.[367] No concrete evidence of lost bids or contracts, revenue dissipation, or lost order volume from the customers was introduced.[368] The record also cannot

---

[364] *KT4 P'rs LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *19 (Del. Super. June 24, 2021).

[365] Pls.' Opening Post-trial Br. 41.

[366] *See supra* Section II.B.3.

[367] Solicitation of customers (or prospective customers) does not necessarily give rise to tortious interference with a prospective economic advantage. *See, e.g.*, *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *11, *26 (Del. Ch. Mar. 5, 2014) (holding after trial that the plaintiff did not demonstrate tortious interference where it lacked a reasonable expectation in securing prospective customers, despite showing that the defendant breached a preliminary injunction preventing it from soliciting the plaintiff's prospective customers).

[368] *See Agilent Techs.*, 2009 WL 119865, at *7 ("[T]o plead a reasonable probability of a business opportunity, [a plaintiff] must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm."); *see also Triton Const.*, 2009 WL 1387115, at *18 (rejecting an argument that the defendant tortiously interfered with job bids where there was nothing in the record "besides [plaintiff's] declaration that it had a reasonable business expectancy to support the conclusion that it did, in fact, have such an expectancy in the jobs in which it did not bid").

support a finding that future expected work from these customers was "reasonably probable" absent Castanon's intentional interference.[369]

The plaintiffs perhaps come the closest to meeting their burden with regard to ProteoWise, which worked with Protoshop when Symbient was at a diminished capacity.[370] Still, proof of Castanon's intentional interference and proximate cause is lacking.[371] There is no evidence that Castanon sought to connect ProteoWise to Protoshop. Rather, Symbient affirmatively referred ProteoWise to Protoshop, and ProteoWise then reached out to Ceriani.[372] Further, the plaintiffs did not prove that Castanon was the proximate cause of their inability to timely complete ProteoWise's requests.[373]

---

[369] *Agilent Techs.*, 2009 WL 119865, at *7 ("To be reasonably probable, a business opportunity must be 'something more than a mere hope or the innate optimism of the salesman' or a 'mere perception of a prospective business relationship.'" (quoting *Wolk v. Teledyne Indus., Inc.*, 475 F. Supp. 2d 491, 512 (E.D. Pa. 2007); *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261 (Del. Super. 2001))); *see also Wayman Fire Prot.*, 2014 WL 897223, at *11 ("[W]hile [plaintiff] has shown that its chances of securing the upgrade contract were something greater than zero, it has not met its burden of demonstrating that those chances were high enough such that it reasonably could expect that [the prospective customer] would select its bid."); *Triton Const.*, 2009 WL 1387115, at *18 ("Even if this Court assumes, as [plaintiff] argues, that it had no opportunity to bid on 131 of the 195 jobs because [defendant] diverted them, [plaintiff] has not proved that it had a reasonable probability of obtaining any of those jobs.").

[370] JX 565; JX 347.

[371] In addition, no specific damages have been proven for this purported loss.

[372] JX 347.

[373] Arguments regarding Coagulo and Sekisui are even more strained. The record shows that Coagulo was dissatisfied with Castanon's exit and sought to retain him as a consultant. *See* JX 185; *see also* JX 180; Jurkiewicz Tr. 693. As to Sekisui, Symbient declined work

### 3. Breach of Fiduciary Duty

Finally, the plaintiffs aver that Castanon breached his fiduciary obligations by misusing confidential information given to him as a Board observer.[374] This claim is baseless.

Castanon did not owe common law fiduciary duties to Symbient after his officer-level position ended.[375] Nor did he not owe contractual obligations akin to fiduciary duties by virtue of the EPA. Perhaps recognizing that these facts, the plaintiffs now focus on Castanon's obligation in the Operating Agreement to "hold in confidence and trust and to act in a fiduciary manner with respect to all information" given to him as a Board observer.[376] Once again, the plaintiffs did not fairly or timely raise the Operating Agreement as a source of liability.[377] Even if they had, there is no evidence establishing that Castanon breached this provision of the Operating Agreement.

---

from the company in August 2021. *See* Helm Tr. 132, 134-35; *see also* JX 482. There is no evidence that Castanon was involved with Symbient's decision to decline Sekisui's work.

[374] Pls.' Opening Post-trial Br. 43; Pls.' Post-trial Reply Br. 29-30.

[375] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 51 (Del. 2006) (explaining that a former director "could not breach a duty he no longer had"); *see also* Balotti & Finkelstein, The Delaware Law of Corporations and Business Organizations, §4.8[B] n.124 (3d ed. 2008) ("[B]oard observers are not subject to the same fiduciary duties as directors.").

[376] Operating Agreement § 3.12(b).

[377] *See infra* note 252.

The plaintiffs introduced evidence that Castanon attended an August 2021 Board meeting where he received confidential materials.[378] But there is nothing in the record showing that he misused the information. The argument that Castanon improperly used Symbient confidential information (i.e., images of devices) to market Protoshop is likewise unavailing. Although the images are obviously of products Symbient created, there is no evidence that Castanon was the one who selected or posted the images on Protoshop's website. The plaintiffs' speculation is insufficient proof.[379]

### D. Unclean Hands

Castanon contends that the doctrine of unclean hands precludes the plaintiffs from obtaining relief. Specifically, he argues that he was wrongfully terminated and that the plaintiffs concealed information from him during negotiations over the Unit Repurchase Agreement. To the extent the doctrine is an available defense to the plaintiffs' legal claims, its predicate requirements are unmet.

The doctrine of unclean hands provides that a "litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits [their] right

---

[378] JX 255; *see also* Finley Tr. 41-43.

[379] *E.g.*, Pls.' Post-trial Reply Br. 29-30 ("The Court can . . . infer that Castanon impermissibly retained these materials, planning to use them for his own competing purposes.").

to have the court hear [their] claim."[380] "In order for the doctrine to apply in the first place, the improper conduct must relate directly to the underlying litigation."[381] The relation must be "'immediate and necessary' [] to the claims for which the plaintiff seeks relief."[382] The conduct must also be "so offensive to the integrity of the court that [the] claims should be denied, regardless of their merit."[383] Nevertheless, the court "has broad discretion in determining whether to apply the doctrine of unclean hands."[384]

Castanon was not wrongfully terminated. He was terminated without cause, as his employment agreement with Symbient permitted.[385] But insofar as it is attributable to the plaintiffs, the Board's conduct while negotiating Castanon's Unit Repurchase Agreement is substandard. The Board tried to conceal information that might have made Castanon less likely to accept a lower offer for his units.

---

[380] *Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 791-92 (Del. Ch. 1998) (quoting *In re Enstar Corp.*, 593 A.2d 543, 553 (Del. Ch. 1991)).

[381] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998).

[382] *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *16 (Del. Ch. June 23, 2021) (citation omitted).

[383] *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008) (quoting *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991)).

[384] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015) (quoting *SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del. 2000)) (citation omitted).

[385] JX 64 at 3.

Regardless, this behavior is neither directly related to the underlying litigation nor "so offensive" as to invoke unclean hands.[386]

Even if it were, Castanon's attempt to invoke equity unravels in light of his own misconduct. "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[387] I decline to apply the doctrine.

## E. The Remedy

The plaintiffs have proven that Castanon breached the non-compete and non-solicit covenants in the EPA. They seek several different remedies for these harms. First, they ask for disgorgement of at least $7.4 million based on the sale of Symbient to Gener8 or, alternatively, compensatory damages of approximately $2.3 million. Second, they request injunctive relief requiring Castanon to abide by the terms of the EPA's restrictive covenants. Finally, they seek payment of their attorneys' fees and costs under a prevailing party provision in the EPA.

---

[386] *See Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 494 (Del. Ch. 2022) (explaining that the doctrine of unclean hands "does not extend to any misconduct, however gross, that is unconnected with the matter in litigation, and with which the opposite party has no concern" (quoting 27 Am. Jur. Equity § 25)); *see also Portnoy*, 940 A.2d at 81 (holding that the plaintiff's aiding in violations of a confidentiality agreement "while being far from pristine, [fell] well short of disqualifying him from seeking relief" for the defendant's breach of fiduciary duty).

[387] *Portnoy*, 940 A.2d at 81 ("[U]nclean hands is a doctrine designed to protect the integrity of a court of equity, not a weapon to be wielded by parties seeking to excuse their own inequitable behavior by pointing out a trifling instance of impropriety by their counterpart . . . .").

1.    "Disgorgement"

The plaintiffs argue that their damages are "show[n] by the valuation of Symbient performed by KPMG for the $14.4 million acquisition" by Gener8.[388] Their theory is that Castanon's breach of his restrictive covenants "destroyed the goodwill and growth" that Gener8 paid to acquire.[389]  The plaintiffs describe this approach as restitution in the form of "disgorgement" for part of the acquisition price.[390]  Regardless of how they style it, the plaintiffs' request is deeply flawed.

Fundamentally, this remedy is untethered from the harm caused by Castanon's breaches of his covenants not to compete or solicit.  "It is a basic principle of contract law that [the] remedy for a breach should seek to give the nonbreaching [] party the benefit of its bargain by putting that party in the position it would have been but for

---

[388] Pls.' Opening Post-trial Br. 45.

[389] *Id.*

[390] *See id.* at 45-46; *see also* Post-trial Argument Tr. (Dkt. 164) 75-76.  Generally, restitution focuses on the harm to the plaintiff as it pertains to a breach of the parties' agreement.  Performance-based damages under a theory of restitution can be measured by "the market value of the plaintiff's uncompensated contractual performance, not exceeding the price of such performance as determined by reference to the parties' agreement." Restatement (Third) of Restitution and Unjust Enrichment § 38(2)(b) (Am. L. Inst. 2011); *see also Norton v. Poplos*, 443 A.2d 1, 4-5 (Del. 1982) (discussing restitution in the context of rescission).  Disgorgement focuses on the defendant's gain from illegal conduct.  It is "the act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *TIAA-CREF Individual & Instit. Servs., LLC v. Ill. Nat'l Ins. Co.*, 2016 WL 6534271, at *10 (Del. Super. Oct. 20, 2016) (quoting *Disgorgement*, Black's Law Dictionary (10th ed. 2014)); *see also Avande, Inc. v. Evans*, 2019 WL 3800168, at *18 (Del. Ch. Aug. 13, 2019) ("The purpose of disgorgement is to deter 'acts of conscious wrongdoing and breaches of a fiduciary's duty of loyalty . . . by requiring the wrongdoer to disgorge any profit made as a result of such wrongful conduct.'").

the breach."[391]   The plaintiffs do not argue that Castanon was unjustly enriched

through the sale of Symbient and the transaction is not the underlying wrong at issue

in this case.[392]   To award damages on this basis, particularly while the plaintiffs

retain the assets and upside, would result in a windfall exceeding the relevant

expectations.[393]

Even if such a remedy were hypothetically available (it is not), I would reject

the plaintiffs' request.   The plaintiffs seek to recover approximately $7.4 million:

$9.6 million "for the value of goodwill" prorated by the time Castanon complied

with his restrictive covenants (14 of 60 months, or 23.3%).[394]   They base their

calculation on a purchase price allocation KPMG LLP performed before Gener8's

acquisition of Symbient (the "PPA").[395]   The PPA allocated $9,657,000 to

---

[391] *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000).

[392] There is no evidence that Castanon gained profits from his breaches of the EPA.  The record does not suggest that he draws a salary from Protoshop or holds any equity interests. Isaacs Tr. 198-99; Castanon Tr. 263; Ceriani Tr. 495.

[393] *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996) (observing that "damages for breach of contract have been limited to the non-breaching parties' expectation interest"); *see also Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005) (explaining that disgorgement "is not an appropriate remedy for a breach of contract" because it "looks to the defendant's ill-gotten gains, rather than to the plaintiffs losses").

[394] *See* Pls.' Opening Post-trial Br. 45-46.

[395] JX 65; *see* Finley Tr. 14-15; d'Almeida Tr. 748-49.  A purchase price allocation assigns the purchase price to the various assets and liabilities acquired.  For example, the PPA allocated a portion of the purchase price to items such as "Cash," "Accounts Receivable," and "Inventory."  JX 65.

"Goodwill."[396]  But, as the defendant's expert Jaime d'Almeida explained at trial, the PPA's goodwill estimate is "an accounting calculation" that "has nothing to do with economic value."[397]  It is simply "the difference between the purchase price and all th[e] assets [KPMG] identified."[398]

I need not consider this remedy further.  It is unfitting and unfounded.

### 2.    Lost Profits

I next consider the plaintiffs' request for expectation damages in the form of lost profits.  Under Delaware law, the standard remedy for breach of contract "is based upon the reasonable expectations of the parties *ex ante*."[399]  One measure of expectation damages is lost profits resulting from the breach. [400]

---

[396] JX 65.

[397] d'Almeida Tr. 756; *see id.* at 760 ("So this [goodwill] isn't valued directly.  It's a residual after subtracting all the other assets that have been – either been identified.").

[398] d'Almeida Tr. 748-49.

[399] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).

[400] *See PharmAthene, Inc. v. SIGA Techs., Inc.*, 2014 WL 3974167, at *7 (Del. Ch. Aug. 8, 2014) ("One measure of expectation damages is a party's lost profits."); *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *16 n.122 (Del. Ch. May 29, 2015) ("[T]his Court has found that, in the context of a breach of a non-compete agreement, lost profits from business within the scope of the parties' non-compete are direct, not consequential damages."); *Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *57 (Del. Ch. Aug. 13, 2021) (noting that "a standard measure of damages that courts deploy in cases involving breaches of restrictive covenants [is] the profits that the venture could have obtained but for the prohibited conduct"); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (awarding the plaintiffs damages equal to "any profits earned by the Defendants that may be attributed to the breach of the Non-Competition Agreement"); *see also NetApp*, 2023 WL 4925910, at *19 (discussing the award of lost profits as a "forward-looking measure" of expectation damages designed "to

The plaintiffs seek damages equal to profits lost after Castanon solicited or encouraged Isaacs, Ceriani, and others to join Protoshop. They rely on the testimony of Dr. Brett Margolin, who estimated that Symbient suffered between $1,529,146 to $2,333,067 in lost profits because of Castanon's actions.[401] Margolin assessed two different components of lost profit damages: "Fee Damages" and "Customer Retention Damages."[402] In rebuttal, Castanon proffered the testimony of d'Almeida, who critiqued Margolin's analysis.[403]

Fee Damages, as described by Margolin, are the result of Symbient's "lost opportunity to deploy" the "services" of "Solicited Employees" and "earn profits on the associated fees and materials revenues."[404] Margolin estimated lost revenue, added profits on expected materials and overhead billing, and subtracted avoided

---

restore the injured party to the economically equivalent position it would have held absent the injury"); *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019) ("When determining expectation damages, courts determine an amount that will give the injured party 'the benefit of its bargain by putting that party in the position it would have been but for the breach.' The primary element of expectation damages is [] 'the value that the performance would have had to the injured party,' or the 'loss in value' caused by the deficient performance compared to what had been expected.").

[401] JX 662 ("Margolin Report").

[402] *Id.* at 6. The "Solicited Employees" are Ceriani, Isaacs, Lupercio, Ancheta, and Taylor. *Id.*

[403] JX 667 ("d'Almeida Report").

[404] Margolin Report 6.

costs including payroll expenses and employee benefits.[405]   His calculation of avoided costs also adjusted for time spent on managerial duties.[406]

Margolin's Customer Retention Damages analysis assumes that Symbient benefits from repeat customer contracting.[407]  Margolin opined that the departure of the solicited employees reduced Symbient's repeat customer pool.  To quantify this effect, he applied the attrition rate to forecast the reduction in repeat customer contracting in the period after the Fee Damages accrued.[408]

Margolin's model also assumes that Symbient was "supply constrained" during the Fee Damages period.[409]  "Supply constrained" means that the demand for Symbient's services exceeded its available professional hours by at least as much as the billable hours lost with the solicited employees.  In other words, had Castanon not solicited certain employees, Symbient could have entered client contracts that would maintain the employees' billable hours.  Margolin also acknowledged that his

---

[405] *Id.* at 7-8.

[406] *Id.* at 8.  In other words, these employees generated value for—and were compensated by—Symbient for both their billing and managerial activities.  This adjustment accounted for the latter.

[407] *Id.* at 6.

[408] Suppose, for example, Fee Damages lasted until 2022, at which time they were $1,000. In that case, Customer Retention Damages would be $700 in 2023, $490 in 2024, and so on.  Fee Damages would be $0 from 2023 and thereafter.

[409] Margolin Report 9.

model presumes the solicited employees would remain with Symbient throughout the relevant period.[410]

Using this approach, Margolin estimated damages of $1,529,146 (assuming that Symbient was supply constrained through 2022) and $2,333,067 (assuming that Symbient was supply constrained through 2024).[411]

I reject Margolin's analysis for several reasons.[412]

First, Margolin's Fee Damages are speculative. The keystone of his analysis is that Symbient would have had more business but for the loss of the solicited employees.[413] Margolin did not, however, identify a single job that was rejected due to insufficient staff.

Moreover, Margolin does not consider mitigation efforts. The calculation of lost profit damages should be offset by a plaintiff's actions to overcome harm caused by the defendant.[414] Margolin accepted that Symbient could not have replaced the

---

[410] *Id.* at 11.

[411] Margolin discounted future year Fee Damages and Customer Retention Damages to present value using a 21% cost of capital. Margolin Report 11.

[412] I also question whether such damages are supported by the terms of the EPA. *See* EPA § 9.2 (providing that Castanon shall indemnify the plaintiffs for "Losses" suffered by the plaintiffs arising out of a "breach of any covenant or agreement" in the EPA); *id.* § 10.1(a) (defining "Losses" as damages "excluding lost profits"). Neither party briefed this matter.

[413] *See* d'Almeida Tr. 790.

[414] *See* d'Almeida Report 42 (quoting AICPA Practice Aid: 06-4 Calculating Lost Profits 45).

solicited employees. But the evidence shows that Symbient managed to replace each of the solicited employees with internal promotions or new hires.[415] With the solicited employees all (or mostly) replaced, any lost profits would be reduced.[416]

Margolin's calculation of Customer Retention Damages is equally conclusory.[417] Margolin provided no backup for his conclusion that each employee's departure "reduce[d] the pool of repeat customers on which future fee volumes depend."[418] There is no reliable evidence suggesting that the departures affected Symbient's ability to retain customers. In fact, only Ceriani was customer-facing.[419]

Ultimately, Margolin sets forth an unreliable measure of damages. I decline to adopt it.

### 3. Damages For Out-of-Pocket Losses

d'Almeida suggests that, to the extent the court is inclined to award damages, a "more appropriate and supported calculation" would be based on the lost value of Symbient's workforce.[420] I agree. The plaintiffs proved that the departure of the

---

[415] *See* Jurkiewicz Tr. 697-98; d'Almeida Report 14-16; JX 373; *see also* d'Almeida Tr. 791-96.

[416] *See* d'Almeida Tr. 789, 791-95.

[417] d'Almeida Report 43-44.

[418] Margolin Report 6.

[419] d'Almeida Report 43-44.

[420] *See id.* at 48.

solicited employees harmed Symbient.[421]  Hiring and training new employees is not costless and internal promotions may divert corporate resources.[422]  Awarding damages measured by these one-time losses will (at least partly) compensate Symbient for Castanon's solicitation of its employees.[423]

As part of Gener8's diligence on the Symbient acquisition, Gener8 engaged KPMG LLP to perform a valuation of Symbient's assets (the "KPMG Report").[424]  Neither party disputes the credibility of the KPMG Report.[425]  Among other things, the KPMG Report valued Symbient's "Assembled Workforce" by estimating the "[a]voided recruiting costs" and "[a]voided training costs and loss of productivity" of each employee.[426]  Hiring and training new employees would drain resources, and the value of Symbient's workforce was the sum total of those avoided costs.  This is a more responsible measure of compensatory damages than that advanced by Margolin.[427]

---

[421] *See* Helms Tr. 104-06, 155; Jurkiewicz Tr. 698, 703.

[422] JX 152 at 23.

[423] *See NetApp*, 2023 WL 4925910, at *17 (describing "out-of-pocket" compensatory damages as "designed to restore the plaintiff to his financial position" before the harm occurred and appropriate to resolve one-time costs).

[424] JX 152.

[425] *See* Margolin Tr. 616-17; d'Almeida Tr. 761-62.

[426] JX 152 at 23.

[427] *See* d'Almeida Report 11; d'Almeida Tr. 787-90.

The KPMG Report estimated the "Assembly Costs" for Symbient's workforce by employee category. The relevant categories and associated assembly costs as applied to the five solicited employees yields total costs of $104,356.00:[428]

| Solicited Employee | Employee Category | Assembly Cost |
|---|---|---|
| Ceriani | Engineer | $32,244.00 |
| Ancheta | Machinist | $22,353.00 |
| Isaacs | Shop Supervisor | $22,189.00 |
| Lupercio | Molding Supervisor | $20,247.00 |
| Taylor | Office Manager | $7,323.00 |
| Total Costs | | $104,356.00 |

Whether Symbient incurred these precise costs in replacing the employees it lost to Protoshop is uncertain. Delaware law does not, however, "require certainty in the award of damages where a wrong has been proven and injury established."[429] The amounts described above provide a non-speculative, "responsible estimate."[430] Accordingly, the plaintiffs are awarded $104,356.00 in damages to compensate them for Castanon's breach of Section 6.8(b) of the EPA.

---

[428] JX 152 at 53.

[429] *Del. Express*, 2002 WL 31458243, at *15 ("Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."); *see also Siga Techs.*, 132 A.3d at 1111 ("The amount of damages can be an estimate.").

[430] *Beard Rsch. Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010).

### 4. Injunctive Relief

In addition to damages, the plaintiffs seek injunctive relief specifically enforcing the EPA.[431] To prove their entitlement to injunctive relief, the plaintiffs must demonstrate (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing an injunction.[432] "Further, to gain specific performance of a covenant not to compete, these elements must be established by clear and convincing evidence."[433]

The plaintiffs established each of these elements. Castanon breached Sections 6.8(a), 6.8(b), and 6.8(c) of the EPA. "[O]ur law has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached."[434] The equities favor issuing an injunction—especially given the unavailability of monetary damages to remedy Castanon's violation of his non-compete. Castanon is enjoined from: (1) soliciting the plaintiffs' employees or customers; and (2) having any involvement with Protoshop or any other Restricted Business, as prohibited by

---

[431] The plaintiffs also requested specific performance of the Operating Agreement but waived any claim based on that agreement. Regardless, the Operating Agreement cannot be specifically enforced against Castanon since he is no longer a member of G8 Holdings.

[432] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009), *aff'd*, 7 A.3d 486 (Del. 2010).

[433] *Hough Assocs.*, 2007 WL 148751, at *14.

[434] *Id.* at *18.

the restrictive covenants in the EPA.[435]  This injunction will remain in place through the end of the EPA's "Restricted Period," which ends on February 20, 2025.

### 5. Attorneys' Fees and Costs

Finally, the plaintiffs seek an award of their attorneys' fees and costs. "Although the so-called American Rule generally requires each party to bear its own attorney's fees, the parties may, of course, by contract shift that burden."[436]  Section 10.14 of the EPA entitles the "prevailing party" to recover "its actual out-of-pocket costs and expenses, including without limitation reasonable attorneys' fees incurred in connection with" "an action to enforce [that party's] rights under [the EPA]."[437] "In determining status as the prevailing party," Delaware looks to "predominance in the litigation."[438]

The predominant issue in this case was whether Castanon breached non-compete and non-solicit covenants in the EPA.  The other claims stemmed from the same factual predicate and involved issues overlapping with Castanon's contractual breaches.  The plaintiffs are the prevailing party on the breach of contract claim

---

[435] EPA § 6.8(a).

[436] *Del. Express*, 2002 WL 31458243, at *23.

[437] EPA § 10.14.

[438] *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004).

85

concerning Sections 6.8 (a), (b), and (c) of the EPA.[439]  Thus, the plaintiffs are contractually entitled to their "reasonable attorneys' fees."[440]

The plaintiffs maintain that I should award the full amount of their fees without limitation.  At present, the plaintiffs have not attempted to quantify the fees and expenses incurred in this litigation.  Without that information, I cannot determine if the fees sought are reasonable—a term that the parties contracted for in the EPA.  Additional submissions are necessary to determine whether the fees and expenses sought are reasonable.

## III.    CONCLUSION

Castanon breached Sections 6.8(a), 6.8(b), and 6.8(c) of the EPA.  Judgment on Count I is entered for the plaintiffs.  The plaintiffs are awarded $104,356.00 in damages, plus pre-judgment interest at the legal rate.[441]  The plaintiffs are also awarded their reasonable attorneys' fees and expenses.  Additionally, an injunction

---

[439] *See id.* (deeming the plaintiffs the "prevailing party," despite receiving 28% of the remedy sought, because "[t]he main issue in th[e] case—and the issue upon which it can be determined the plaintiffs predominated in litigation—[wa]s the interpretation of the Agreement"); *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *33 (Del. Ch. Oct. 14, 2015) (explaining that "[t]o achieve predominance, a litigant should prevail on the case's 'chief issue'" (quoting *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009))).

[440] EPA § 10.14.

[441] *See Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) ("In Delaware, prejudgment interest is awarded as a matter of right.") (citing *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209 (Del. 1978)).

is issued requiring Castanon to abide by Sections 6.8(a), 6.8(b), and 6.8(c) of the EPA until February 20, 2025.

The plaintiffs did not prevail on Counts II through V. Judgment is entered for Castanon on those claims.

Castanon also committed contempt and spoliation. As remedies, I have drawn limited adverse inferences in favor of the plaintiffs and award the plaintiffs their reasonable attorneys' fees and expenses incurred in bringing the motion for sanctions.

The parties shall confer on an order to implement this decision and file it within 30 days. The parties shall also confer on a schedule for submissions to resolve the reasonableness of the plaintiffs' fees and expenses.